**Barry M. GOLDWATER, Plaintiff-Appellee,**

**v.**

**Ralph GINZBURG, Defendant-Appellant,**

**Warren Boroson, Defendant,**

**and**

**Fact Magazine, Inc., Defendant-Appellant.**

**Nos. 496–499, Dockets 32804–32807.**

United States Court of Appeals
Second Circuit.

Argued April 15, 1969.

Decided July 18, 1969.

Roger Robb, Robb, Porter, Kistler & Parkinson, Washington, D. C., Louis H. Powell, Peter G. Corbett, Regan, Goldfarb, Powell & Quinn, New York City, for appellee.

Harold E. Kohn, David H. Marion, Louis E. Levinthal, Philadelphia, Pa., Stanley S. Arkin, New York City, Helen H. Stern, Dilworth, Paxson, Kalish, Kohn & Levy, Philadelphia, Pa., Harris B. Steinberg, New York City, for appellants.

Before WATERMAN, SMITH and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge:

This is a libel action brought by Senator Barry M. Goldwater against Ralph Ginzburg, Warren Boroson, and Fact Magazine, Inc. The action, a diversity action, was commenced in the Southern District of New York and is based upon the publication of the September-October 1964 issue of a magazine called Fact, an issue which was heralded as "The Unconscious of a Conservative: A Special Issue on the Mind of Barry Goldwater." The appellant Ginzburg, the President and sole stockholder of Fact Magazine, Inc., was editor and publisher of Fact, and Boroson was its managing or contributing editor. Fact Magazine, Inc. was a New York corporation with its principal offices in New York, and Ginzburg and Boroson were citizens of New York. The appellee, Senator Goldwater, was a citizen of the State of Arizona and at the time the magazine was published and distributed was a United States Senator from that State and the candidate of one of the two major political parties for election to the office of President of the United States.

The Complaint charged that Fact contained numerous "false, scandalous and defamatory statements referring to and concerning plaintiff" and, on a comprehensive but not on an all-inclusive basis, it set forth a number of specific examples of them. These statements, it alleged, "were published and circulated by defendants with actual malice, or with reckless disregard of whether such statements were false or not, and with the deliberate, wilful and malicious purpose and intent to injure plaintiff and to deprive plaintiff of his good name and reputation as a person, a public official and a candidate for office and to bring plaintiff into disrepute and subject him to public scorn, contempt, obloquy and ridicule." The Complaint also alleged that as a result of these statements plaintiff was injured in his reputation, was held up to public scorn, contempt, obloquy

and ridicule, and suffered great mental pain and anguish. Compensatory damages were demanded in the sum of $1,000,000 and punitive damages in a like amount.

The Answer denied that any statements contained in the magazine were false or defamatory and denied that the magazine and the statements were published and circulated with actual malice. Moreover, the defendants pleaded the affirmative defenses of truth, of fair comment and of privilege based on the fact that plaintiff was a United States Senator and a candidate for the Presidency at the time the magazine was published and the alleged fact that it was published without actual malice.

The defendants moved for summary judgment. The motion was heard and denied by Judge Inzer B. Wyatt, who held that a jury might infer actual malice from admissions made by appellant Ginzburg on deposition and from various documents produced by defendants in the course of discovery proceedings. Goldwater v. Ginzburg, 261 F.Supp. 784 (S.D.N.Y.1966). Leave for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) was denied by this court on January 12, 1967.

After fifteen days of trial before Judge Harold R. Tyler, Jr. and a jury, the jury returned a verdict against all three defendants. The appellee was awarded $1.00 in compensatory damages against appellant Ginzburg, Boroson, and appellant Fact Magazine, Inc., and punitive damages in the amounts of $25,000 against appellant Ginzburg and $50,000 against appellant Fact Magazine, Inc. The defendants filed post-verdict and post-judgment motions, all of which were denied by the trial judge.

Defendant Boroson did not file a notice of appeal, but defendants Ginzburg and Fact Magazine appeal from Judge Wyatt's decision denying defendants' Motion for Summary Judgment and from Judge Tyler's decision denying a post-verdict motion for judgment notwithstanding the verdict and new trial and leave to present oral argument thereon, from the judgment he ordered entered on the verdict, and from his decision denying a post-judgment motion under Fed.R.Civ.P. 60(b) for relief from the judgment and for a new trial.

After a full review of the lengthy record we do not find that error was committed by the experienced district judges below. We affirm their decisions, and we affirm the judgment entered upon the jury verdict.

The events which culminated in the publishing of the September-October 1964 issue of Fact and which then resulted in the institution and prosecution of this libel action began during the week of the July 1964 Republican National Convention. Ginzburg and Boroson watched the convention together and neither of them was pleased that Senator Goldwater had received the Republican nomination for the Presidency. On July 16, immediately following Senator Goldwater's nomination, Ginzburg and Boroson, desiring, so they testified, to alert the American people to the Ginzburg-Boroson-perceived dangers of a Goldwater presidency, decided to publish the "Goldwater issue" of Fact.[1]

They agreed that Boroson "would commence to gather research of every scrap of information in the public record that was relevant to a psychobiography of Goldwater," and that Ginzburg would gather the opinions of psychiatrists across the land by means of a poll and then would write an article on Goldwater for publication in the magazine.

On July 16, 1964, before any research or polling had commenced, Boroson wrote a letter to Mr. Walter Reuther which

---

1. When this September-October issue of Fact was advertised by them in mid-September the appellants stated that they wished

"* * * to stress that FACT has no political axe to grind in presenting this story. FACT is a *non-partisan* magazine." New York Times advertisement September 12, 1964, p. 26.

asked for his comments about Senator Goldwater's personality and which indicates that appellants had decided to asperse Senator Goldwater's character on preconceived psychiatric or psychological grounds of their own fabrication. The Boroson letter to Mr. Reuther stated in part as follows:

"I'm writing an article for Fact about an old enemy of yours—Barry Goldwater. It's going to be a psychological profile, and will say, basically, that Goldwater is so belligerent, suspicious, hot-tempered, and rigid because he has deep-seated doubts about his masculinity. * * *"

Mr. Reuther did not respond to the letter.

Boroson then started his research. This involved the reading of various articles, newspaper stories and books dealing with Senator Goldwater. Certain portions of this material which Boroson thought "gave some sort of insight into * * * [Goldwater's] psychological makeup" were marked for Ginzburg's attention. There was evidence that the Boroson markings were highly selective.

Derogatory statements about Senator Goldwater were marked, but complimentary statements were not, even though they occurred within the same paragraph and even though they qualified the damaging statements.[2]

As a result of this "research" Boroson produced a "research draft," the theme of which was a comparison between Senator Goldwater and the "Authoritarian Personality."[3] This draft was submitted to Ginzburg about August 27, 1964. Ginzburg deleted most of Boroson's references to the authoritarian personality and reached the conclusion, which Boroson had not expressed, that Senator Goldwater was suffering from paranoia and was mentally ill.

At the same time that Boroson was researching Senator Goldwater's life, appellants prepared and sent a letter and a questionnaire to a list of psychiatrists.[4] The solicited psychiatrists were invited to answer, with their comments, the question, "Do you believe Barry Goldwater is psychologically fit to serve as President of the United States? [ ] No [ ] Yes." This poll was conceived

2. Two of many examples of this technique are sets of markings made by Boroson on page 14 of the issue of June 23, 1961 of Time Magazine. The italicized sentences are those marked by Boroson and are the only portions that were published in Fact. " * * * Finally, the Goldwaters sent him to Virginia's strait-laced *Staunton Military Academy. During Barry's first year, academy officials repeatedly asked Baron Goldwater to take back his undisciplined heir.* But four years later, when Barry earned his diploma, he was captain of the football team, and he wore on his uniform the medal given to the school's outstanding cadet." [See p. 8 of Fact]

"Goldwater store salaries were—and are —just average by Phoenix standards; but Barry, now an inactive, $12,000-a-year board chairman, is still fondly remembered by old employees for his introduction of pensions and profit sharing and for off the cuff kindness. Once the son of an employee told Goldwater that he might lose his paper route because his bike had been stolen; Barry had a new bike delivered to the boy that day. *He also harassed employees with the Goldwater brand of practical jokes; such as shipping*

*live mice through the pneumatic tube system to the secretarial pool."* (The emphasized sentence, less the word "also" is quoted in Fact at page 11.)

3. Evidence showed that Boroson's draft, or at least one of his drafts, included a discussion of homosexuality in connection with Senator Goldwater. This draft, to which was attached a magazine article on homosexuality, suggested that Senator Goldwater was a "submissive-passive-homosexual"; that the "masculine facade that Goldwater has thrown up helps fool many people"; that he was suffering from "repressed homosexuality" and "fears of a homosexual type." Elements of this draft's discussion appeared in the article that was finally published in Fact.

4. Contrary to the statement in Fact (p. 24) that "The names were supplied by the American Medical Association," the list of psychiatrists was rented from a mailing list company, without any communication with the American Medical Association itself. The mailing list company, however, was licensed by the American Medical Association to rent its mailing lists.

and planned by Ginzburg and Boroson, who had no training or prior experience in the techniques of polling and who had made no study of it, without first consulting or securing any advice from any expert in the field.

A letter written by Ginzburg with the assistance of Boroson and signed by Boroson as "managing editor" of Fact accompanied the questionnaire addressed to psychiatrists. The letter stated in part:

"A recent survey by Medical Tribune showed that psychiatrists—in sharp contrast to all other MDs—hold Goldwater in low esteem. Among MDs generally, approximately two-thirds prefer Goldwater over Johnson. But among psychiatrists, the preference is for Johnson by ten to one.

We would appreciate, first, your indicating whether you think Goldwater is stable enough to serve as President by checking the appropriate box on the enclosed sheet of paper. We would also appreciate any remarks you might care to make concerning Goldwater's general mental stability, insofar as you are able to draw inferences concerning it from his public utterances, his political viewpoints, and whatever knowledge you may have of his personality and background. Does he seem prone to aggressive behavior and destructiveness? Does he seem callous to the downtrodden and needy?

Can you offer any explanation of his public temper-tantrums and his occasional outbursts of profanity? Finally, do you think that his having had two nervous breakdowns has any bearing on his fitness to govern this country?" [5]

Although defendants emphasized in their letter that the survey showed that "among psychiatrists, the preference is for Johnson by ten to one," over Goldwater, they failed to point out that according to the same survey, a survey conducted prior to the Republican National Convention, the preference was even more overwhelming for Mr. Johnson over other leading pre-convention candidates for the Republican nomination. Defendants also neglected to mention that the Medical Tribune noted that "two-thirds of the psychiatrists favor a democratic candidate. (They were the only specialty group to choose Kennedy over Nixon in the pre-election poll of 1960.)"

The covering letter also referred to Senator Goldwater as having had "two nervous breakdowns." At trial Ginzburg testified that when the letter went out the only information he had about these alleged breakdowns was found in two articles by one Alvin Toffler. One of the articles was published in the December 1959 issue of Pageant Magazine;[6] the other appeared in the May 1964 issue of Good Housekeeping.[7] The

5. The Medical Tribune survey referred to in the covering letter appeared in the weekend edition of Medical Tribune, June 20–21, 1964.

6. Pageant, December 1959, p. 57: "In 1936, after a stretch of intensely hard work in the family store, Goldwater suffered a nervous breakdown. Following a period of rest he returned to the business, took on the presidency of the company, and plunged in again. Two years later, when he went to Prescott, Arizona, to open a new branch, Goldwater worked five days and five nights without any sleep. On the fifth night, he recalls, 'I just blew my stack.'

"When a doctor told him he wouldn't have long to live unless he slowed down, Goldwater taught himself to take catnaps

and tried to bridle his temper. He has never had a third breakdown, but he is still faintly tense and can fly into a tantrum on provocation."

7. Good Housekeeping, May 1964, p. 62: "One crisis occurred in 1937 when, after a period of intense work in the store, Barry suffered a nervous breakdown. After a lengthy rest, he went back to work. But two years later, when he went to Prescott, Arizona, to help open a new branch of the store, and spent five days and nights without sleep, he cracked again. 'His nerves broke completely,' says Mrs. Goldwater. 'He couldn't sleep nights. He was very nervous. I immediately said we were going to get away to Honolulu. He was seasick all the way. But then he relaxed on the beach and just

Toffler articles, purporting to be based upon an interview with Mrs. Goldwater, stated that in 1936 or 1937 as a result of overwork, Senator Goldwater suffered a nervous breakdown; and that two years later, also because of overwork, he suffered a recurrence.[8]

Ginzburg admitted in his testimony that the expression "nervous breakdown" attributed to Mrs. Goldwater is an imprecise lay term, and is a loose expression that may mean many things; however, he admitted that he had made no attempt to find out precisely what Mrs. Goldwater meant by the expression. Nor in his letter to the psychiatrists did Ginzburg think it necessary to mention any of the circumstances that preceded the alleged breakdowns.

The Boroson research draft as revised, rewritten, and edited by Ginzburg appeared as the first part of the two part "Goldwater issue" and was entitled "Goldwater: The Man and the Menace" by Ralph Ginzburg. In addition to the adverse political comments about Goldwater, the Ginzburg article directly and indirectly attacked Goldwater's character, personality, and family relationships. The article's central theme—that Goldwater suffered from, among other things, paranoia, a serious mental disease—was developed in the article by statements such as:

> " * * * he [Goldwater] shows unmistakable symptoms of paranoia * * *." [Fact p. 4]

> " * * * On the free-for-all stage of American politics all his aggressions, hostility, all his fears and delusions of persecution, all his infantile fantasies of revenge and dreams of total annihilation of his adversaries found a perfect platform." [Fact p. 15]

> " * * * In fact the Senator's political career sounds like a continuous paranoid nightmare—he is repeatedly 'knifed in the back' by his friends." [Fact p. 15]

rested.' The change of pace was, apparently, all he needed."

"The motivating psychological force of such attacks [by Goldwater on other Republican leaders] is an inner conviction that everybody hates him, and it is better to attack them first. That is why the theme of betrayal—so typical of the paranoiac—is recurrent in Goldwater's utterances * * *." [Fact p. 18]

"Goldwater's proneness to engage in public name-calling fits into the mold of a paranoiac who tends to see issues in terms of people. * * *" [Fact p. 20]

"This paranoia is expressed in many minor but significant habits which reflect his general distrust of people around him * * *." [Fact p. 21] " * * * his paralyzing, deep-seated, irrational fear * * *." [Fact p. 21]

"It is his paranoid divorce from reality that is the most dangerous facet of Goldwater's personality. * * *." [Fact p. 22]

The article's concluding paragraph was:

> "In the context of Barry Goldwater's personality, this is not a call for an impossible victory, nor even what Senator Fulbright sarcastically termed 'a bold, courageous and determined policy of co-annihilation.' It is a fantasy of a final conflagration, the twilight of the gods, in which he—and the whole hostile world—will heroically play out the last act of the Human Drama. *If it sounds like the death-fantasy of another paranoiac woven in Berchtesgaden and realized in a Berlin bunker not long ago, it is no surprise.*" (Emphasis added.)

Ginzburg was willing to publish that Senator Goldwater had a paranoiac personality, a conclusion which if it had been honestly reached at all was reached only upon his own non-expert evaluation of Senator Goldwater's life and political career. The conclusions in the published article were never evaluated by any ex-

8. See footnote 14, *infra*.

pert in the field of psychiatry or reviewed by anyone else on the staff of Fact. He attempted to explain this temerity by testifying that he had taken two college courses in psychology, and had read various books on the subject, which had aided him in his evaluation. Boroson, who had prepared the original draft, testified to a comprehensive knowledge of the field to justify his non-professional evaluation.

Ginzburg, moreover, desiring that the conclusion that Senator Goldwater was paranoiac should not appear to rest upon his own non-expert evaluations only, went one step further. He attempted, for the benefit of his readers, to bolster his own conclusions by showing that other persons, including persons close to the Senator, were reaching similar conclusions. For example, the article states:

"Many people around Goldwater think he needs a psychiatrist—probably not because they realize how sick he is—but because of the daily symptoms of hostility he manifests * * *." [Fact p. 20]

But when asked on deposition the identity of those "people around Goldwater," Ginzburg was unable to name any such person who had ever expressed the thought or had ever given an opinion that the Senator needed a psychiatrist. Likewise, the article states:

" * * * only recently, when during the convention in San Francisco—for the first time in American history—armed guards were posted around a non-incumbent Presidential candidate (even before he was nominated) did his aides begin to realize how paranoid he was * * *." [Fact p. 21]

Ginzburg was asked for the basis of this statement that "for the first time in American history" armed guards were posted around a non-incumbent Presidential candidate, and he was unable to cite any authority for the statement except his own "lifetime of reading." He made no investigation to determine what the facts of the matter were. If he had checked only casually he would have discovered that there were armed guards posted about Governor Scranton and his party at this same 1964 Republican National Convention in San Francisco at the same Mark Hopkins Hotel. Asked on deposition, "Who were the aides to whom you referred?" Ginzburg replied:

"A. Not to any one specifically, but just to members of his entourage to whom I expect his paranoia must have been as evident as it appeared to me.

"Q. Well can you name one aide who realized at that time that Senator Goldwater was paranoid? A. No. I cannot."

The article also reported that:

"The mystery surrounding his [Goldwater's] movements, the rude, rough strictness of his bodyguards, and the general atmosphere around 'the leader' reminded many European reporters of Germany in the 1930's." [Fact p. 21]

Asked on deposition who were the European reporters that he referred to, Ginzburg responded, "I don't recall who I had in mind when I wrote that statement." [9]

Other related themes developed throughout the article were that Senator Goldwater felt "uneasy about his masculinity," [10] was "sadistic," [11] was anti-

---

9. Moreover, the resident manager of the Mark Hopkins Hotel testified by deposition that the Pinkerton men on Senator Goldwater's floor never displayed any weapons and were very polite.

10. A sampling of statements in the article relating to Senator Goldwater's alleged doubts about his manhood is as follows: "* * * Is it possible that Goldwater's nervous breakdowns were provoked by his intense anxiety about his manhood, anxi-

ety that was aggravated by his work in a ladies' department store? * * *. [Fact p. 11]
"But Goldwater's 'masculine' facade fools many people * * *." [Fact p. 17]

11. A sampling of statements inferring that Senator Goldwater was sadistic is as follows:
"Those psychoanalysts who find a connection between sadism and an anal character * * *." [Fact p. 7]

Semitic,[12] and had unusual intra-family loyalties and dislikes.[13]

Ginzburg also stressed the fact that Goldwater reportedly had suffered two nervous breakdowns. This was done despite the fact that he knew, from statements in the press that had come to his attention, that Senator Goldwater, Mrs. Goldwater, Dr. Leslie Kober of Phoenix, Arizona, Senator Goldwater's friend and personal physician for many years, and Harry Rosenzweig, an intimate and lifelong friend of the Senator, all denied that Senator Goldwater had ever had "a nervous breakdown" in the medical sense of the phrase.[14] Ginzburg rejected these statements of the Goldwaters and their close friends without interviewing or attempting to interview them.

The second part of the "Goldwater issue" was entitled "What Psychiatrists Say About Goldwater" by Warren Boroson. It seems that Boroson wrote only the first three introductory paragraphs of this section, the content of the paragraphs was based upon information supplied by Ginzburg, and that Ginzburg did all the other work on the section. Boroson's name was retained only in order to avoid having two articles appear under Ginzburg's name.

This section presented the results of the "poll" of psychiatrists, and included a "sampling" of the comments made by the responding psychiatrists.

This "poll" and the technique used were impugned at the trial by an expert witness of appellee. The expert witness, Burns W. Roper, the well-known poll taker, testified that the Ginzburg-Boroson technique was not a valid method of conducting a poll. Moreover, during the time the poll was being conducted and while the results were being tabulated, reputable psychiatrists and the principal psychiatric professional associations sent Fact letters denying the validity of the

---

" * * * the first recorded incident of a sadistic juvenile practical joke perpetrated by Goldwater in his adulthood * * *." [Fact p. 11]
" * * * still delights in mean practical jokes and exhibitionist acts of hostility, * * *" [Fact p. 14]
" * * * his irrationally cruel and spiteful pranks * * *." [Fact p. 15]

12. The Ginzburg article states that Senator Goldwater "does not identify with the Jewish part of his heritage," and is ashamed of the fact he is Jewish. It also insinuates on pages 5 and 6 of Fact that the Senator is anti-Semitic. Ginzburg admitted, however, that when he wrote this article he had before him articles in which the Senator was quoted as saying that he was proud of his Jewish heritage and background. Although Ginzburg quoted from these articles he omitted in his article any reference to these favorable statements.

13. Various statements in the article intimated that Senator Goldwater had unusual intrafamily attitudes toward his mother and his father—
" * * * This is a man who obviously identifies with a masculine mother rather than an effeminate father * * *." [Fact p. 15]
" * * * Senator Goldwater sums up his feelings about his father this way: 'I

would never be where I am today if it had not been for my mother, my family, my wife—and' no, *not* his father, but 'my wonderful environment.' (Saturday Evening Post, 8/15/64.)" [Fact p. 5]
and his oldest son—
" * * * The Senator seems to have been rather antagonistic and reserved toward Barry, Jr., as though he were a rival. * * *" [Fact p. 9]

14. At trial Mrs. Goldwater testified that she had been married to Senator Goldwater since 1934 and that he had never suffered any mental illness or shown any sign of one or of any mental disturbance whatever and that he had never consulted a psychiatrist or received psychiatric treatment. She testified that in her interview with Mr. Toffler she had said that her husband had become exhausted from the physical labor of opening a new store, that she and her husband went on vacation for a week or ten days, and that he was fine when they got home. She testified that although she may have used the term "nervous breakdown," that expression to her meant "just being overly tired * * * not a mental breakdown." She did not tell Mr. Toffler, or intend to tell him, that Senator Goldwater had any mental difficulty. Moreover, she did not say, as Toffler reported, that there was more than one episode of exhaustion.

project.[15] Nevertheless, Ginzburg published this second section of the "Goldwater issue" in which he presented the results of the poll.

According to the story, the questionnaire had been sent to 12,356 psychiatrists and 2,417 of them responded. Of these 2,417, 571 said they did not know enough about Senator Goldwater to answer the question; 657 answered "Yes," that they thought Senator Goldwater was psychologically fit to serve as President; and 1189 answered "No," in the belief that he was not.[16]

The record discloses that 1,749 out of 2,417 responses to the Fact questionnaire were unsigned. In publishing many of these anonymous responses Ginzburg labeled them "Name withheld" followed by an "M.D." as if the doctors had actually signed their responses but had requested that their names be withheld. An examination of the original documents discloses that 31 of the 45 letters Ginzburg labeled as "name withheld" in the magazine were anonymous letters. Ginzburg's explanation for this was that the terms "anonymous" and "name withheld" were "used interchangeably for the sake of variety in the magazine." He denied that he was attempting by this device to conceal the fact that the letters were anonymous. However, one letter, a letter which criticized the poll and which bore the signature, name and address of the writer, Ginzburg published as "anonymous." He attempted to justify this by stating that he labeled the letter "anonymous" in order to save the doctor from embarrassment.

Ginzburg admitted that he personally edited all the published responses to Fact's questionnaire. In many instances, a misleading version of the original response resulted from this editing. Statements favorable to Senator Goldwater were deleted, especially statements casting doubt on the assertion that the Senator had suffered nervous breakdowns. Ginzburg also added to the original letters phrases, sentences and paragraphs, some of which he wrote himself and some of which he claimed to have taken from other letters, which he could not identify. He combined or "melded" letters, or "distilled" them as he saw fit.

There was no indication in the published versions of most of the letters that any part of the originals had been omitted or tampered with. Ginzburg testified that it should have been obvious to any intelligent reader that there were omissions. In attempting to explain that in the publishing of some letters some omissions were indicated, whereas in others the omissions were not, he stated that he had made an editorial judgment not

15. Among them was a letter from the American Psychiatric Association dated August 3, 1964, signed by Dr. Walter E. Barton, Medical Director, and reading as follows:

"Many members of this association have, with justifiable indignation, called our attention to a questionnaire you have sent them asking whether they 'think Barry Goldwater psychologically fit to serve as President of the United States.'

"A physician renders an opinion on the psychological fitness or mental condition of anyone in the traditional (and confidential) doctor-patient relationship in which findings are based upon a thorough clinical examination.

"Being aware of this, should you decide to publish the results of a purported 'survey' of psychiatric opinion on the question you have posed, this Associa-

tion will take all possible measures to disavow its validity."

16. The results of the survey and the accompanying comments were represented as the "professional opinions" of the responding psychiatrists. Accepting the phrase "professional opinion" in its normal meaning in this context, one would suppose the answers had all been expressions of professional psychiatric opinion. However, when one reads the full, unedited responses it appears that though the comments were in some cases professional psychiatric opinions, in others they were not professional opinions at all, but only the political opinions of the individual psychiatrists. Ginzburg attempted to dodge this issue by testifying that by "professional opinions" he only meant the opinions of the professional men who were psychiatrists.

to show omissions by ellipses, but a few such indications had "crept in by error."

A full appreciation of the tone and tenor of the articles in the "Goldwater issue" can only be had by reading the full text of the two articles. The statement of facts presented here is only an abbreviated version. Other equally damaging statements and charges not set forth here are contained in the full articles.[17]

## I.

By seeking election to the office of President of the United States, Senator Goldwater invited the press and the public to scrutinize every aspect of his life, public and private alike. His mental and physical health were proper targets for investigation and for adverse comment. We live in an age of powerful nuclear, chemical and biological weapons capable of massive destruction. These weapons are under the ultimate control of the President, and knowledge of the mental stability of the men who seek to be President is not only relevant but indeed crucial if the electorate is to choose intelligently the man to occupy our most powerful office.

 Newsprint expended on Senator Goldwater and the other candidate in the 1964 presidential election, incumbent President Johnson, would fill hundreds of shelves. As might be expected, not all that appeared in print was laudatory or was true; deadline pressures, editing errors, faulty research, and partisan outlooks no doubt contributed to the publication of erroneous statements.[18] The

"Goldwater issue" of *Fact,* however, was believed by the Senator to have been maliciously inspired and was so full of error and so highly offensive to him that he commenced this defamation action in September 1965, ten months after the election. Nevertheless, regardless of how erroneous and offensive the publication, the Senator, because the publication was made while he was seeking a high office, is not permitted to recover defamation damages unless he can indeed prove that the publication, no matter now scurrilous, "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). With this rule of law in mind, a rule necessary to preserve if we are to have a continuing robust approach to matters and men political, we turn to a discussion of the points appellants raise for our consideration and determination.

██ The "Goldwater issue," appellants contend, even if it contained falsehoods, was protected speech under the First Amendment, and the interpretive *New York Times* and related decisions dictate that the court below should have granted appellants' motion for summary judgment. We do not agree. False statements are protected only if they are honestly made. New York Times Co. v. Sullivan, *supra* at 278, 84 S.Ct. 710.

The use of calculated falsehood, however, would put a different cast on the constitutional question. * * *

The climate in which public officials operate, especially during a political campaign, has been described by one commentator in the following terms: "Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent." Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875 (1949), New York Times v. Sullivan, 376 U.S. 254, 273 n. 14, 84 S.Ct. 710 (1964).

17. Also, scattered throughout the "Goldwater issue" are a number of uncomplimentary suggestive cartoons, some of which are exceedingly coarse. One of the more offensive ones, for example, depicts Senator Goldwater clad only in a loose-fitting diaper which has a question mark on the front of it. The Senator is peering down to look at the area the diaper covers.

18. In the highly charged atmosphere of a political campaign it is not unlikely that emotional, biased and false statements may occasionally be made.

**336**

For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. * * * " Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031, 1035. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection. Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

If appellee's response to appellants' motion "set forth specific facts showing that there * * * [was] a genuine issue for trial," here the crucial issue of whether actual malice motivated the publication, then the court below properly denied the motion. Fed.R.Civ.P. 56 (e).

■ To show appellants' state of mind and lack of good faith, at the hearing on the motion for summary judgment the appellee relied on circumstantial evidence which appellee maintained cumulatively might lead a jury reasonably to conclude that appellants published the article with actual malice. Appellee submitted the covering letter that Ginzburg mailed to the psychiatrists with the questionnaire, and pointed out from the transcript of Ginzburg's pre-trial deposition certain of his testimony. After considering this material the trial court stated that a jury might infer actual malice from it, and the judge set it forth seriatim in his opinion, as follows:

1. The covering letter with which the questionnaire was mailed to the psychiatrists.

2. Ginzburg had information about the "nervous breakdowns" mentioned in the covering letter from one source only, and did not know whether or not that source had the information from personal knowledge.

3. In showing how the psychiatrists' letters were signed, "name withheld" was used interchangeably with "anonymous," that is, replies which were unsigned were shown as "name withheld" which might be found to suggest that they had been signed.

4. A letter from the Medical Director of the American Psychiatric Association warned of the invalidity of the Fact survey because responses were sought despite the fact that none of those asked to respond had made a "thorough clinical examination." Ginzburg read this letter before he published the magazine. The letter was not published with the questionnaire.

5. Ginzburg did not read in their entirety articles from which he took quotes to supply the basis for his own piece. Instead, he read only the parts underscored for him by others. Thus, at times he would quote one part of an article without quoting another part which might tend to qualify or contradict the part quoted. He omitted contradictory material within the same sentence when quoting from that sentence.

6. There are some statements in Ginzburg's article for which he could not establish a basis on his deposition.

7. There is much to indicate alteration of responses from the psychiatrists. For example:

a. a *signed* letter which was critical of the Fact survey was published as "anonymous";

b. one published "letter" was in fact a "distillation" of the original,

done by Ginzburg, without so indicating in the magazine;

 c. there were occasions when two responses were published as one reply;

 d. in one letter the words were changed and rewritten by Ginzburg;

 e. on two occasions qualifying paragraphs in a response were omitted when published; and

 f. Ginzburg testified as to one response that he "didn't even consider" whether it was true or false, and that all he cared about was printing what the man said. Goldwater v. Ginzburg, *supra*, 261 F.Supp. at 787.

As can be seen, appellee and the district judge did not rely on a few isolated instances of derogatory statements which could be charitably thought of as being nonactionable negligent or good faith misstatements of fact, but rather upon the totality of appellants' conduct, as evidenced by the proffered materials, from which a jury might reasonably find a predetermined and preconceived plan to malign the Senator's character. The fact that appellants' supporting affidavit denied that the "Goldwater issue" had been published with actual malice does not require that their motion for summary judgment be granted, especially in light of appellee's countering materials. St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

■ Citation of sources for most of the statements about Senator Goldwater in Part I of the "Goldwater issue" and the accurate reprinting in Part II of most of the original responses of psychiatrists to the *Fact* questionnaire, does not, as appellants appear to claim,

insulate appellants from responsibility for any of the false statements they made. Reliance upon newspaper articles, books, and campaign literature, and upon accurate reprinting of another's letter are only factors which, with other factors, are probative of whether the publisher of the cumulated material was motivated by actual malice when he caused the full material to be published. Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports. St. Amant v. Thompson, *supra* at 732, 88 S.Ct. 1323. Furthermore, in our case, Ginzburg added certain innuendoes to some quoted statements [19] and quoted other statements out of context [20] in order to support his predetermined result. One cannot fairly argue his good faith or avoid liability by claiming that he is relying on the reports of another if the latter's statements or observations are altered or taken out of context. Also, if Ginzburg's "melding" and "distillation" of letters results in misplaced emphasis, or exaggeration, or distortion, he cannot reasonably maintain that the misstatements contained in the new product he thereby created are not his own misstatements.

Viewing the submitted materials and the inferences which might be drawn from them "in the light most favorable to the party opposing the motion," United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), the district court properly concluded that a trier of fact should have the opportunity to decide whether appellants were liable to appellee.[21]

---

19. See note 13, *supra*.

20. See note 2, *supra*.

21. Cases relied on by appellants for the proposition that the federal courts should liberally grant summary judgment to give First Amendment freedoms "breathing space" are inapposite to this case. Thompson v. Evening Star Newspaper Company,

129 U.S.App.D.C. 299, 394 F.2d 774, cert. denied, 393 U.S. 884, 89 S.Ct. 194, 21 L. Ed.2d 160 (1968), and Washington Post Company v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), cert. denied, 385 U. S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), cited by appellants, were cases in which the non-moving party failed to file affidavits or other papers to refute the

## II.

### *The Alleged Prejudicial Trial Occurrences and Post-trial Rulings.*

Appellants moved for directed verdicts at the close of the appellee's case and at the close of all the evidence. The motions were denied and appellants claim error. They also argue that appellee's action should have been dismissed because appellee neither pleaded nor proved special damages; that the jury's award of $1.00 was insufficient to support punitive awards; that the trial judge erroneously refused to instruct the jury in accord with appellants' request; that the instructions as given confused the issues, were inadequate and erroneous as to appellee's burden of proof, erroneous as to the proof necessary to establish actual malice, and erroneous as to the jurors' power on the evidence before them to award punitive damages; and that it was prejudicial error not to exclude expert opinion testimony as to the validity of appellants' poll taking methods. They also, as stated earlier, moved for judgment n. o. v., claiming as in their motions for directed verdicts that the law and the evidence did not here sanction any recovery for libel. Insofar as these claims deserve separate discussion we turn to a discussion of them.

### A.

The evidence presented at trial is challenged as being constitutionally insufficient to establish actual malice. Appellants seem to raise, expressly or implicitly, three points: (1) the publication was not libelous; (2) appellee did not prove its falsity; (3) actual malice was not proved by clear and convincing evidence. We disagree with appellants.

A false accusation of insanity, mental imbalance, or mental disease, is libelous *per se* under New York law, Bishop v. New York Times Co., 233 N.Y. 446, 135 N.E. 845 (1922); Brunstein v. Almansi, 71 N.Y.S.2d 802 (Sup.Ct. Nassau Co. 1947). Traditionally in cases of libel *per se* when New York law is the applicable law defamatory statements are presumed false and the defendant has the burden of establishing their truth E. g., Segel v. Barnett, 34 Misc.2d 591, 226 N.Y.S.2d 141 (Sup. Ct. Montgomery Co. 1962); Flynn v. Confidential, Inc., 10 Misc.2d 1032, 169 N.Y.S.2d 784 (Sup.Ct.N.Y.Co.1957); Faulk v. Aware, Inc., 9 Misc.2d 815, 169 N.Y.S.2d 363 (Sup.Ct.N.Y.Co.1957). The United States Supreme Court, however, has altered this principle of state libel law when the suit is brought by a public official or by a public figure. In such a case the burden of establishing that the published material was false is on the plaintiff. See New York Times Co. v. Sullivan, *supra* 376 U.S. at 271, 84 S.Ct. 710. This change was recognized by the court below and explained to the jury.[22]

---

moving party's affidavits and to show that a genuine issue of fact existed. In such circumstances summary judgment, if appropriate, is entered upon the moving party's unanswered motion. Fed.R.Civ. P. 56(e). Here, however, appellee, the non-moving party, filed affidavits and relevant materials to show affirmatively that there was a genuine issue of fact for a trier of fact to resolve, the existence of appellants' possible actual malice.

Appellants also cited, *inter alia*, Times Inc. v. McLaney, 406 F.2d 565 (5 Cir. 1969) in which the Fifth Circuit reversed a denial of summary judgment where the record demonstrated that appellants had done a great deal of investigating and had checked reliable sources before they published the allegedly defamatory article.

Here, however, appellee contends that appellants did not do any reasonable checking of sources and materials. Appellants also cited United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 404 F.2d 706 (9 Cir. 1968) cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969) which is equally inapposite.

22. At one point in his charge to the jury Judge Tyler stated:
 * * * although the law traditionally has placed on defendants in a libel case the burden of proving truth, here in this case plaintiff, as a practical matter, has undertaken the burden of proving falsity of certain statements in Fact. Appellants contend that the words "as a

Appellee introduced into evidence numerous official Air Force documents and personal health records, and the testimony of his personal physician, Dr. Kober, for the purpose of establishing that he was not suffering from the mental disease attributed to him by appellants. Also, all of appellee's unofficial personal health records were made available for appellants to study and scrutinize and most of these records were introduced into evidence at the trial. Therefore, appellee had produced enough proof to require that the issue of whether the appellee was of sound mind be submitted to the jury for decision.

■ There are many parallels between the evidence tending to prove actual malice in this case and the proof in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), which the Supreme Court held was sufficient to establish actual malice.[23] The Goldwater article did not contain "hot news"; the appellants were very much aware of the possible resulting harm; the seriousness of the charges called for a thorough investigation but the evidence reveals only the careless utilization of slipshod and sketchy investigative techniques; appellants were not psychiatric experts nor did they have any expert review "Goldwater: The Man and the Menace" or evaluate its conclusions; they persisted in their polling project despite warnings by reputable professional organizations

practical matter" improperly suggest that appellee was not required to assume the burden of proving falsity. Perhaps, if read in isolation, the instruction could be interpreted in accordance with appellants' contention, but

> The impact of a jury instruction "is not to be ascertained by merely considering isolated statements but by taking into view all the instructions given and the tendencies of the proof in the case to which they could possibly be applied." Seaboard Air Line R. Co. v. Padgett, 236 U.S. 668, 672, 35 S.Ct. 481, 482, 59 L.Ed. 777. Curtis Publishing Co. v. Butts, 388 U.S. 130, 156–157, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

Read in the context of all the instructions contained in the charge it is clear that the court only meant that before appellee could establish the appellants' actual malice he first had to prove the falsity of the statements the appellants published. The whole charge clearly and adequately informed the jury of the burdens of proof each of the parties had to carry. Additional references by the trial court to the appellee's burden of proof are:

> Sixth is the element of falsity, and, as I said earlier, plaintiff has frankly taken the burden of proving falsity of various relevant statements in both the first and second sections of *Fact*.

And two hours before the jury reached a final verdict the jury requested the court to reply to the following, read into the record by the court:

> Number 3, in order to determine actual malice, must it be first degree [sic (probably "agreed")] that the test of falsity in element number 6 has been met? Can actual malice be legally determined if the test of falsity is not there?

The court answered and instructed:

> I listed for you seven essential elements which the plaintiff must prove. He has taken upon himself as proving one of those elements, to wit, the element of falsity. Obviously he has spent considerable time in this case, as you know, trying to prove that a number of these statements were false. Therefore, I think the answer to your last question in simple terms is yes. He has no complaint, and he admitted that here during his case, about statements in this magazine that are not false. He is only complaining about statements which he says demonstrably are false and he maintained the burden of showing a lot of these statements are false. Of course, you have to find these other elements present, including, of course, as you suggest by your very question, the element of actual malice. I think it is fair to answer your last question simply by saying yes.

23. See also Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) in which the Supreme Court remanded a right of privacy case, after reversing a verdict for plaintiff. Part II of the Court's opinion described the process of writing and editing the objectionable story. The facts given there, the Court stated (provided, of course, the trial court gave proper instructions) were sufficient to permit a jury to find upon the retrial the existence of actual malice.

that their techniques lacked validity; and, obviously there was evidence as to whether there was a possible preconceived plan to attack Senator Goldwater regardless of the facts.[24] This evidence, together with the other facts brought out at trial established that the appellants not only knowingly published defamatory statements but also established with convincing clarity that the appellants were motivated by actual malice when they published these defamatory statements. Therefore, we hold that the trial judge properly denied appellants' motions for directed verdicts presented at the close of plaintiff's evidence and at the close of all the evidence and properly submitted the case to the jury. Needless to say, we also hold that the trial judge, after the jury had returned its verdict, properly denied appellants' post-verdict motion for judgment notwithstanding the verdict and new trial, and their other post-verdict related motions, which similarly were based upon allegations that appellee had failed to prove his case.

### B.

 Appellee did not plead or prove special damages in the court below and appellants argue that this failure required the dismissal of appellee's action. Judge Wyatt, in denying appellants' motion for summary judgment, rejected this argument on the ground that the controlling New York law did not require that special damages be pleaded and proved in a *libel per se* case.[25] 261 F.Supp. 784, 788 (SDNY 1966). We agree. Nothing in the *New York Times* case or related case indicates that federal law is to oust state law on this point. In fact, in Curtis Publishing Co. v. Butts, *supra*, the Supreme Court af-

firmed a substantial judgment for the plaintiff even though plaintiff neither sought nor obtained special damages for specific pecuniary losses.

 The jury's award to Senator Goldwater of nominal compensatory damages and substantial punitive damages was within its province under the applicable New York law. See, e. g., Holmes v. Jones, 147 N.Y. 59, 66–67, 41 N.E. 409 (1895); Kruglak v. Landre, 23 A.D.2d 758, 258 N.Y.S.2d 550, 551 (2d Dep't 1965); Klein v. Western Union Telegraph Co., 257 A.D. 336, 13 N.Y.S.2d 441 (1st Dep't 1939); Amory v. Vreeland, 125 A.D. 850, 110 N.Y.S. 859 (1st Dep't 1908); see also Reynolds v. Pegler, 223 F.2d 429, 434 (2 Cir.) (Medina, J.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955); Stevenson v. Hearst Cons. Publications, Inc., 214 F.2d 902, 911 (2 Cir. 1954). Absent a conflict between New York law and the First Amendment's protections, there is no reason for disturbing this long established New York practice. Cf. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). No such conflict exists here.[26] [C]ircumstances outside the publication itself [may] reduce its impact sufficiently," 388 U.S. at 161, 87 S.Ct. at 1994, so that a jury may feel compelled to award a complaining party only nominal actual damages. However, if nominal damages are awarded, the offending book, magazine, or newspaper publisher may not then avoid any additional liability, which a libeller in a different occupation normally might incur, by claiming a special status or an entitlement to special protections under the First Amendment. Curtis Publishing Co. v. Butts, *supra*, 159–161, 87 S.Ct.

---

24. E. g., the Reuther letter, quoted from on p. 329, *supra*.

25. See Cabin v. Community Newspapers, Inc., 27 A.D.2d 543, 275 N.Y.S.2d 396 (2d Dep't 1966); Raffa v. Shilbury, 24 A.D.2d 814, 263 N.Y.S.2d 876 (3d Dep't 1965); McKinnon v. Smith, 52 Misc.2d 349, 275 N.Y.S.2d 900 (Sup.Ct.Queens Co.1966).

26. Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) do not cause us to reach a contrary conclusion.

1975. The book, magazine or newspaper publisher who with actual malice prints defamatory falsehoods about a public official or public figure has put himself beyond the pale of the First Amendment. A jury award of punitive damages against one who publishes falsehoods with actual malice serves two wholly legitimate purposes: (1) the protection of the libeled individual's reputation and (2) the protection against like abuse of all other persons similarly situated. *Id.* at 161, 87 S.Ct. 1975. This underpinning supporting awards for punitive damages in libel cases was clearly and correctly explained to the jury by Judge Tyler in his charge. No doubt the jury believed that Ginzburg should be admonished against a repetition of his misconduct [27] and that the malice-inspired smears on Senator Goldwater's reputation should be removed and its perpetrators punished.

### C.

The appellants contend that the charge to the jury confused rather than clarified the issues. A reading of the complete charge and the record refutes this contention; nothing contained therein suggests that the jury was confused. The jury's five requests for repetitions of instructions or for further instructions over a period of approximately eleven hours of deliberation appear only to reflect the jury's awareness of the difficult and delicate issues posed by the case.

Appellants complain that the trial judge misinterpreted the holding in New York Times Co. v. Sullivan, *supra,* and erroneously charged the jury that, of the seven elements of proof the plaintiff had the burden of substantiating, six could be satisfied if plaintiff had established them by a preponderance of the evidence, but that clear and convincing evidence was necessary before they could find that the defendants had acted with actual malice. Appellants advance the novel theory that plaintiff had to prove *all* the elements of his case by evidence of convincing clarity and cite *Sullivan.* There is nothing in New York Times v. Sullivan or elsewhere to support appellants.

The *Times* decision changed state libel law only to the extent of requiring public officials to prove actual malice with convincing clarity. 376 U.S. at 285–286, 84 S.Ct. 710. Other elements of proof, such as that the statements were written and that the statements were communicated to third persons, need only be proved by a preponderance of evidence—the burden of proof imposed by New York law. See Erie v. Tompkins, *supra.* Appellants' reliance on the Court's reference in New York Times v. Sullivan to "constitutionally defective" and "constitutionally insufficient" evidence that libelous statements by the defendant newspaper were "made of and concerning plaintiff Sullivan" is a mistaken reliance. In that portion of its opinion the Court was not referring to a general standard of proof. Rather the Court stated that the evidence submitted was constitutionally insufficient to support the Alabama jury's finding that the allegedly libelous statements were "of and concerning" plaintiff Sullivan despite the fact that Sullivan was not named in the New York Times advertisement which Sullivan alleged had libeled him. The evidence submitted in

---

27. Ginzburg admitted that he intended to continue such conduct in the future. He testified that his magazine "Avant Garde" (the successor to Fact with which that publication had merged) had undertaken a similar poll of psychiatrists with respect to President Johnson, in preparation for the 1968 campaign; that when he initiated this project he had reason to doubt Mr. Johnson's sanity. He said that he was proud of the Goldwater issue of Fact, that he would not change a word of it, except that he would change "Colorado" to "Arizona" in the sentence on page 8 stating that "Barry Goldwater marched off to the University of Colorado." He believed that the issue was "in the finest tradition of American journalism" and "will go down in history as an historic contribution to American journalism," and he intended to keep on publishing similar surveys in the future.

*Sullivan* only showed that the defendant newspaper had leveled an impersonal attack on certain government operations. Thus the Court concluded that there was "no legal alchemy" by which a State could create for an individual government official a private cause of action for libel by transmuting an impersonal criticism of a government and the operations of that government—manifestly protected speech under the First Amendment—into libelous personal criticism of the officials who compose the government criticized. New York Times v. Sullivan, *supra* 376 U.S. at 292, 84 S.Ct. 710. Of course the derogatory articles, statements, and cartoons Fact published were leveled at Senator Goldwater personally. No one claims, or could legitimately claim, otherwise.

■■■ The trial court, appellants also argue, erroneously permitted the jury to find actual malice from evidence of negligence and ill will. The record is to the contrary. The court below not only charged the jury but also emphasized in the charge that neither negligence nor failure to investigate, on the one hand, nor ill will, bias, spite, nor prejudice, on the other, standing alone, were sufficient to establish either a knowledge of the falsity of, or a reck-

less disregard of, the truth or falsity of the materials used. Moreover, the court properly instructed the jurors that they should consider all the evidence concerning appellants' acts and conduct in publishing Fact in deliberating upon whether the defendants published with actual malice. There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. See, e. g., Curtis Publishing Co. v. Butts, *supra*.

The appellants also claim that the trial judge instructed the jury that punitive damages could be awarded without finding compensatory damages. This claim is rejected.[28] The structural organization of the charge makes it clear that an award of punitive damages had to be conditioned upon first finding compensatory damages, and, of course, actual malice. The manner in which the jurors apportioned the damages eloquently indicates that they understood these principles.

■■■ At one point during the giving of an additional charge, a colloquy between the court and a juror occurred.[29] This colloquy, according to the appel-

---

28. The question is somewhat academic since the jury did award compensatory damages.

29. Juror No. 4: I am not sure that I heard you completely correctly and I just want to clarify this in my own mind. Is the basis of punitive damages the belief of the jury that there was a mean, malicious intent on the part of the defendant, if so found?

The Court: Yes. That is part of it. That is what I meant really when I said here you can consider whether or not the proof shows any ill will or spite or maliciousness in the publication. Also, however, you should keep in mind that the theoretical backdrop or underpinning, as I called it, for punitive damages, the law considers punitive damages to be a device or method of deterring a defendant who is found guilty of libeling somebody from doing it again.

I emphasize to you the law also, and I think wisely, leaves it solely to your dis-

cretion. In other words, it is perfectly possible that you could find a person has actually libeled the plaintiff, but you decide under all the circumstances that though you award that plaintiff compensatory damages you think it is not just or desirable to assess in addition punitive damages.

You are quite right, sir, in answer to your question, if you were to find any maliciousness or ill will which inspired the publication, you should certainly consider that upon this question of punitive damages.

Juror No. 4: If such were not found, could punitive damages still be assessed purely as a deterrent?

The Court: I think the answer to that would be yes. If you decided under all of the circumstances that the situation was one where you thought it desirable to assess such damages in order to deter future conduct of this kind. In other words, the answer to your last question is yes.

lants, left the jurors confused as to the standards applying to awards of punitive damages. Of course this colloquy cannot be examined in isolation. The court had originally instructed the jury that they must find actual malice and award compensatory damages before reaching the question of punitive damages, and that an award of punitive damages was in their sole discretion. The court then added that ill will or spite on the part of the defendants could be considered in connection with punitive damages, and that punitive damages might be awarded as a deterrent, irrespective of ill will or spite, but in either case " * * * it is obvious that you must find actual malice in the sense defined." These instructions were in accordance with the law. See Curtis Publishing Co. v. Butts, *supra*.[30]

### D.

[21, 22] Burns W. Roper, head of the well-known Roper public opinion survey organization, was permitted, over defendants' objection, to testify at the trial to the effect that appellants did not use a valid method of conducting a poll. This evidence, appellants argue, was irrelevant for at most it would only tend to show that appellants were negligent pollsters. Consequently, the argument continues, its admission was prejudicial error. We disagree. As already stated, *supra, Times* does not hold that evidence of negligence is inadmissible; it only holds that evidence which merely establishes negligence in failing to discover misstatements, without more, is constitutionally insufficient to support the finding of recklessness required to establish actual malice from proof of less than prudent conduct. Recklessness is, after all, only negligence raised to a higher power. To hold otherwise would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness. It would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact, certainly a situation not intended by the Supreme Court. See St. Amant v. Thompson, *supra*, 390 U.S. at 732–733, 88 S.Ct. 1323.

Appellants also argue that it was error to admit an expert opinion which related entirely to an ultimate fact in issue—that of the defendants' knowing and reckless falsity—on which the jury did not need the aid of an expert. Again, we reject appellants' argument. First, the law as stated by the Supreme Court and by this circuit is to the contrary, not to mention the clear provisions of Rule 43(a) of the Federal Rules of Civil Procedure. See Transportation Line v. Hope, 95 U.S. 297, 24 L.Ed. 477 (1877); Carlson. v. Chisholm-Moore Hoist Corporation, 281 F.2d 766 (2 Cir.), cert. denied, 364 U.S. 883, 81 S.Ct. 172, 5 L.Ed.2d 104 (1960); see also Wigmore, Evidence §§ 1920 and 1921 (3d ed.). Second, the cases from other circuits cited by appellants do not support their contention in the context of this record, for they only hold that an expert may not express his conclusion concerning the ultimate fact that the jury must decide, see, e. g., Garza v. Indiana and Michigan Electric Company, 338 F.2d 623, 626 (6 Cir. 1964); Rebmann v. Canning, 390 F.2d 71, 74 (3 Cir. 1968), and Mr. Roper was not asked to, nor did he, express his conclusion as to whether the appellants were reckless in conducting their poll. He discredited their methods by comparing them with good polling practices. Moreover, within the discretion of the trial court, expert opinion is always appropriate where the jury would benefit from technical

---

30. Appellants complain that the trial court did not discuss the First Amendment and refused their first three requests to charge which dealt with it. There is no basis for this complaint. Counsel were permitted to argue the subject before the jury; and the judge, in his charge, although not specifically mentioning the First Amendment except in one instance, instructed the jury fully on the applicable principles of law. Nothing more was required.

assistance. Duff v. Page, 249 F.2d 137 (9 Cir. 1957); see, also, Schillie v. Atchison, Topeka & Santa Fe Railway Co., 222 F.2d 810, 814 (8 Cir. 1955).

### III.

Two months after the entry of judgment appellants filed a motion under Fed.R.Civ.P. Rule 60(b) for relief from the judgment and for the grant of a new trial on the ground that they had obtained newly discovered evidence which they could not have discovered in time to move thereon for a new trial under Fed.R.Civ.P. 59(b). Appellants claimed that two oral statements attributed to Dwight D. Eisenhower by Arthur Larson in Larson's book that had just been published, "Eisenhower, The President Nobody Knew," would have helped the defense. The motion was properly denied. Judge Tyler acted well within the bounds of his discretion. Whatever Eisenhower's considered evaluation of Goldwater may truly have been at the time Fact was being prepared and edited the acts of the appellants were not motivated in any way by that evaluation, for they were unaware of it.

The orders appealed from and the judgment are affirmed.