**A. E. HOTCHNER, Plaintiff,**

**v.**

**Jose Luis CASTILLO–PUCHE and Doubleday & Company, Inc., Defendants.**

**DOUBLEDAY & COMPANY, INC., Defendant and Third-Party Plaintiff,**

**v.**

**Ediciones DESTINO S. L., Third-Party Defendant.**

**No. 74 Civ. 5516–CLB.**

United States District Court, S. D. New York.

Nov. 12, 1975.

Mervin Rosenman by Mervin Rosenman, Simon J. Hauser, New York City, for plaintiff.

Satterlee & Stephens by Robert M. Callagy, Robert P. Marshall, Jr., New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

In this diversity action filed December 17, 1974 to recover damages for libel and invasion of privacy, defendant Doubleday & Company, Inc. (hereinafter "Doubleday") has moved for summary judgment dismissing the complaint as to it "upon the ground that the statements complained of in the complaint are about a public figure and were not published by Doubleday with knowledge of their falsity or with reckless disregard of the truth thereof, and are therefore constitutionally privileged."

Plaintiff A. E. Hotchner ("Hotchner") is an author and was a friend and sometime companion of the late Ernest Hemingway. Defendant Jose Luis Castillo-Puche ("Puche"), a resident of Spain, wrote a book in Spanish entitled *Hemingway Entre la Vide y la Muerte* (hereinafter "the book" or "the Spanish Edition"), which was published in Spain in 1968 by third-party defendant Ediciones Destino S.L. ("Destino"). Plaintiff is referred to in a generally uncomplimentary fashion in the Spanish Edition and, for purposes of this motion, defendant concedes that these unfavorable characterizations are not truthful, and that the toned down English version also defames him.

The Spanish Edition came to the attention of Doubleday. On May 18, 1970, after having it read and reviewed by knowledgeable persons, Doubleday purchased the English language rights to the book from Destino. Doubleday caused the book to be edited, translated, prepared for publication, printed and sold in the United States. On this publication, which took place in New York, plaintiff bases this action. Counsel agree that New York law applies.

I

Both Puche and Hotchner were friends of Hemingway and each claims to have been well acquainted with Hemingway's life and thoughts in the years immediately prior to his death in 1961. Hotchner is the author of a book entitled *Papa Hemingway, A Personal Memoir*, which was serialized in an American magazine in March and April, 1966 and published in the United States immediately thereafter with a substantial degree of commercial success.

Defendant contends that Hotchner is a public figure and, therefore, the standard applicable to plaintiff's claims is that first enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There, it was held, on First Amendment grounds, that a public official may recover damages for libel only if the defamatory publication "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. The scope of this protection was extended in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), where the *New York Times* standard was applied to plaintiffs in defamation actions who were "public figures," although they did not hold public office.

The "public figure" doctrine was reaffirmed in words in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342–43, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), but the range of its application has been left cloudy. In defining the class of plaintiffs whose claims are limited by the *New York Times* rule, the Supreme

Court in *Gertz* used language which appears simple enough: "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . . ." 418 U.S. at 342, 94 S.Ct. at 3008. *Gertz* further held that designation as a public figure

"may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." 418 U.S. at 351, 94 S.Ct. at 3013.

Although readily articulated, these standards pose difficulties in their application, as evidenced by the *Gertz* decision itself. Without reviewing the facts of the *Gertz* case in detail, the Supreme Court there treated as a "private citizen," as contrasted with a "public figure," a prominent attorney who had involved himself in civil litigation against a policeman, brought by the family of a murdered youth to recover money damages for wrongful death. The policeman had been convicted of murder in the second degree. The civil case, closely related to a criminal prosecution, and the motives of those bringing it, as well as its possible chilling effect on future police action would seem clearly within the area of protected First Amendment activities, "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people" (*Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L. Ed.2d 1498, quoted with approval in *New York Times Co. v. Sullivan, supra* at 269, 84 S.Ct. at 720 [1964]).[1]

In addition to injecting himself voluntarily into this area of public controversy, Gertz had achieved some public prominence in his own right. He had served as an officer of the National Lawyers Guild, and had "considerable stature as a lawyer, author, lecturer, and participant in matters of public import" [fn. 3 of *Gertz*, p. 330 of 418 U.S. p. 3002 of 94 S.Ct. quoting from the opinion below, 471 F.2d 801, 805].

■ Perhaps if attorney Gertz was not a public figure, nobody is.[2] But at least the *Gertz* Court in words reaffirmed the *New York Times* principle.

1. Gertz was a reputable lawyer. His detractors were ostensibly extremist followers of the late John Birch, whose activities are resented by those who normally would be expected to champion First Amendment freedoms. Defendants in *Gertz* in their publication accused Gertz of being an architect of the "frame-up" of the policeman, of having, himself, an extensive police record, having been a "Communist-fronter" and a member of the "Marxist League for Industrial Democracy, originally known as the Intercollegiate Socialist Society, which has advocated the violent seizure of our government."

2. Whether an attorney is a public figure clearly depends upon the circumstances of the particular case. An attorney does not become a public figure or public official solely by reason of his membership in the bar of a state. In *Belli v. Curtis Publishing Company*, 25 Cal.App.3d 834, 102 Cal. 122 (1972), the plaintiff attorney conceded that he was a public figure and subject to the *New York Times* rule. But see, *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579 (5th Cir. 1967), *cert. denied* 393 U.S. 825, 89 S.Ct. 88, 21 L.Ed.2d 96 (1968). In *Aronstein v. The Village Voice, Inc.*, N.Y.L. J., February 3, 1975, p. 2, col. 2 (Sup.Ct., N.Y. County), the Court did not find it necessary to determine whether a lawyer who was acquitted of criminal charges and who, the allegedly libelous article charged, had a "sleazy reputation among his fellow lawyers" and had "specialized in defending Mafia members" was a public figure since the Court found that the complaint which pleaded actual malice was sufficient to state a claim even under the *New York Times* standard. *Frink v. McEldowney*, 29 N.Y.2d 720, 325 N.Y.S.2d 755, 275 N.E.2d 337 (1971) held that an attorney, employed by a town to render legal opinions on matters of town interest, was a public official.

■ Under New York law, "[t]he decision as to whether, under the circumstances, a privilege exists, is for the court and not the jury." *Duffy v. Kipers*, 26 App.Div.2d 127, 271 N.Y.S.2d 338, 341 (4th Dept. 1966) (governmental officer acting within scope of official duties). See also, *Phillips v. Murchison*, 252 F.Supp. 513 (S.D.N.Y.1966), *aff'd. in relevant part, rev'd. in other parts*, 383 F.2d 370 (2d Cir. 1967) (privilege accorded reports of judicial proceedings); *Cheatum v. Wehle*, 5 N.Y.2d 585, 594, 186 N.Y.S.2d 606, 612, 159 N.E.2d 166 (1959) (fair comment); 2 E. Seelman, The Law of Libel and Slander in New York, ¶ 592.

■ In *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966), the Supreme Court instructed the trial court upon retrial "that, as in the case with questions of privilege generally it is for the trial judge in the first instance to determine whether the proofs show [plaintiff] to be a 'public official.'" Whether a party is a "public official" is more readily ascertainable than whether he is a public figure, and is a fact upon which it is unlikely that reasonable minds could differ. However, the cases appear to authorize this Court to determine whether Hotchner is a "public figure," just as we would determine whether another plaintiff is a "public official."

■ We further note that the amended complaint states as a second claim for relief an invasion of plaintiff's statutory right of privacy under N.Y. Civ.Rights Law § 51. Construing this statute in light of the *New York Times* standard, *Time, Inc. v. Hill*, 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) held that the First Amendment barred recovery for "false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." See *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 542, 42 L.Ed.2d 419 (1974). Whether a matter is of "public interest" and provides its author and publisher with this qualified privilege is likewise an issue for the court's determination. *Man v. Warner Bros., Inc.*, 317 F.Supp. 50 (S.D.N.Y.1970). See also *Gordon v. Random House, Inc.*, 486 F.2d 1356 (3d Cir. 1973), *vacated*, 419 U.S. 812, 95 S.Ct. 27, 42 L.Ed.2d 39 (1974); *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970); *Wasserman v. Time, Inc.*, 138 U.S.App.D.C. 7, 424 F.2d 920, *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970). But see, *Taggart v. Wadleigh-Maurice, Ltd.*, 489 F.2d 434 (3d Cir. 1973), *cert. denied*, 417 U.S. 937, 94 S.Ct. 2653, 41 L. Ed.2d 241 (1974).

■ Although the issue of whether a plaintiff in a defamation action is a public figure poses a mixed question of law and fact, it is nevertheless one for the Court, not the jury, to determine.

In *Montandon v. Triangle Publications, Inc.*, 45 Cal.App.3d 938, 120 Cal. Rptr. 186, *cert. denied*, 423 U.S. 893, 96 S.Ct. 193, 46 L.Ed.2d 126 (1975), the Court held that an author who made promotional appearances on radio and television was "a public figure and a person of general newsworthiness," finding it unnecessary to detail the evidence which supported this conclusion. Without referring to the *Gertz* decision, the Court adopted the definition of a public figure pronounced in *Cepeda v. Cowles Magazines and Broadcasting, Inc.*, 392 F.2d 417, 419 (9th Cir.), *cert. denied*, 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968):

"'Public figures' are those persons who, though not public officials, are 'involved in issues in which the public has a justified and important interest.' Such figures are, of course, numerous and include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done."

Plaintiff Hotchner has written several novels and nonfiction books, as well as articles, short stories and original television plays. His work, *Papa Hemingway*,

previously mentioned was his most successful. *Papa Hemingway* has sold at least six hardbound printings and six pocketbook printings and was a Book of the Month Club selection.

In the Spring of 1948, Hotchner had been a staff writer for the magazine "Cosmopolitan", which dispatched him to Cuba, in his words, "to ask Hemingway to write an article on a particular topic." From that beginning there developed a close personal friendship which continued until July 2, 1961, when Hemingway killed himself.

As a result of his close association with Hemingway, Hotchner created a number of adaptations of Hemingway's works for use in radio, television and motion pictures. During the period from 1966, when his book appeared, to the present, Hotchner has given lectures for fees concerning Hemingway's activities. Hotchner's works have appeared on television and in widely circulated popular magazines.

Although *Papa Hemingway* has brought Hotchner some measure of notoriety, it is doubtful whether his name is widely-recognized. In reaching its conclusion that attorney Gertz was not a public figure, the Supreme Court observed:

> "Although petitioner was . . . well-known in some circles, he had achieved no general fame or notoriety in the community. None of the prospective jurors called at the trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population. We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public figure question to a more meaningful

context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz v. Robert Welch, Inc., supra*, 351–52, 94 S.Ct. at 3013.

Accordingly, it would appear that, although Hotchner was the author of a "best seller" literary work, he cannot be considered a public figure for all purposes unless and until the Supreme Court modifies the doctrine of *Gertz*.

Defendant argues alternatively, with considerable persuasion, that Hotchner, by publishing *Papa Hemingway*, and by adapting works of Hemingway for television, movies, records and ballet, voluntarily "inject[ed] himself . . . into a public controversy" surrounding the latter years of Hemingway's life, or into the controversy, stated in narrower terms, of Hotchner's personal relationship with Hemingway. Plaintiff admits that he is "thought of in some way, as a Hemingway authority, having known him and dealt with his work and having received some recognition because of it." (Deposition of A. E. Hotchner, April 3, 1975, p. 66).

*Gertz* did not overrule prior decisional law which extends the protection of the *New York Times* standard to defendants in actions brought by *bona fide* public figures. In *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker*, 388 U.S. 130, 154–55, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967), Justice Harlan, writing for a plurality of the Court, explained the rationale for the more stringent standard for recovery by public figures:

> "We note that the public interest in the circulation of the materials here involved, and the publisher's interest in circulating them, is not less than that involved in [*New York Times v. Sullivan, supra*]. And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled 'public figures' under ordinary

tort rules. . . . Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." [citations omitted].

Hotchner injected himself into the controversy surrounding the later years of Ernest Hemingway's life. Hemingway's life as an expatriate is a matter of considerable public interest, as is evidenced by the success of Hotchner's book and by Doubleday's interest in Puche's book. Hotchner did not profess to enter into the public discussion as an academic biographer, literary critic or detached observer of Hemingway. In the Foreword to *Papa Hemingway,* Hotchner wrote:

"I was his close friend for fourteen years, right up to the day he died. I knew about his life: the adventures, the conversations, the dreams and disillusions, the triumphs and defeats of this complicated, unique, humorous, intense, fun-loving man who was Ernest Hemingway. . . ."

The alleged defamation resulted from Puche's later published rejection of this claim of intimate knowledge.

Hotchner continues to be an active author who lectures and contributes to popular magazines frequently. Hotchner has access to publications " 'to expose through discussion the falsehood and fallacies' of the defamatory statements." Indeed, Hotchner's access to certain publications may have been improved by his personal involvement in this controversy.

Accordingly, upon the affidavits submitted with this motion, and the depositions and answers to interrogatories, the Court finds that, for purposes of this litigation, plaintiff Hotchner has achieved the status of a public figure.

## II

Finding Hotchner is a public figure, and the *New York Times* standard is to apply, plaintiff will have to demonstrate that the book was published with actual malice. "Actual malice," here means knowledge of the falsity of the published statements or reckless indifference as to whether they are true or false. "Actual malice" is to be distinguished from a bad or corrupt motive or some personal spite or desire to injure the plaintiff, *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967), although such subjective factors may be relevant to the issue of "actual malice."

Doubleday asserts, without contradiction, that it purchased the English language rights to the book from Destino, a reputable Spanish publisher and third-party defendant in this action. Destino published the book in Spain in 1968 without let or hindrance, or litigation, by Hotchner or other persons defamed therein.

Doubleday secured the services of a Spanish translator to translate Puche's Spanish text into English. An Editor, whose affidavit in support of the motion has been considered, was assigned to supervise the publication of the American edition. The Editor discovered certain uncomplimentary remarks concerning the plaintiff. Following established policy at Doubleday, the Editor referred these passages to Doubleday's Contracts Department for their "review from the standpoint of libel." In so doing, the Editor attached a note which reads in part:

". . . the author of this book doesn't seem to like Hochner (sic) very much; . . . I don't really think anything [Castillo-Puche] says in the book about Hochner (sic) is libelous—it's probably just bitchy. But I thought you should look at the attached pages, which refer to Hochner (sic), and say whether you think it's okay to publish with this sort of sideswiping left in."

The Assistant Contracts Manager, in a responding memorandum, recommended that certain references to Hotchner "be toned down or eliminated." He also observed:

"When looked at together these statements certainly ridicule Hotchner and impugn his reputation and character. As he seems to be an author who has worked in movies and TV, this could be a serious matter.

To make matters worse I doubt whether any of these statements can be substantiated in any way."

In their affidavits supporting the motion for summary judgment, both the Editor and the Assistant Contracts Manager assert that they had no suspicion that anything said in Puche's book about Hotchner was false.

Doubleday's Editor wrote a letter to Puche, dated August 6, 1973, discussing certain pre-publication difficulties, among them Doubleday's concern about the references to Hotchner. In soliciting the author's approval to alter the translated version of his text, the Editor wrote:

"The third important matter which I'd like to take up with you concerns the possibility of libel to Hotchner in your book. You are certainly entitled to your opinion of Hotchner, and you may very well be right—it seems to our lawyers that it would be a good idea if we would tone down some of your remarks about him, on the off chance that he could possibly bring suit against you. The fact that he is an American author with quite a reputation, and also I seem to recall a professor, it's possible that he would think some of your remarks border on "malice" (in the legal sense) and that it would be professionally damaging to him, which in a legal sense could come under the legal grounds "damaging to his reputation and character". It is, in my opinion, not really awfully important in terms of what you are trying to say in this book to get at

Hotchner, one way or the other, very strongly—he's just not important enough as a character in the story you are telling to risk, it seems to me, a libel suit, or even a lot of unpleasantness in the American press; your book is wonderful in enough ways, you make enough valid points about Hemingway and his relationship with Spain (which is your real theme), so that I think that you can afford to be more discreet with Hotchner, simply for the good of your own reputation in the United States and the success of the book. If it's okay with you I will tone down your remarks on him, rather slightly. If you like I will send you the pages on which I do this, so that you can see how it reads. I certainly won't make Hotchner look marvelous—it's a question of degree and choosing a milder word for an unadmirable characteristic here and there."

In a letter from Madrid on September 12, 1973, Puche responded in part:

"3rd.—I don't mind that you lighten the words with which I qualify Mr. Hotchner, specially taking away anything that could be used as a libel suit against me. Nevertheless, I don't want him to appear as a man who was in Ernest's most sincere trust and as a possessor of all his secrets, like he made it look in his book. He was always a servant to Hemingway, who didn't mind much about him. Ernest did not always talk highly of him. To me he said once that Mr. Hotchner was a man he wouldn't want to be left alone in a room with.

Even so, I have no interest in offendering (sic) Mr. Hotchner. You could, then, as you said, send me the pages in which this toning down has taken place and I hope to be able to give my approval immediately."

Thereupon, Doubleday's Editor revised the text intending "that the substance of the statements should not be changed, as the author's unique views of Hemingway and his entourage, already published and

received well elsewhere, should be preserved in the English language edition."

Plaintiff contends that the observations of the Doubleday employees and the exchange of correspondence with Puche, when taken together with errors found in the Spanish edition by Doubleday's translator, demonstrate that Doubleday was or should have been on notice that Puche may have been motivated by some animus toward Hotchner. Plaintiff contends that, so alerted, Doubleday should have made reasonable attempts to check the truth of the statements made and the accounts of incidents described. Since Doubleday was not faced with the deadline pressures that plague newspaper editors, plaintiff contends that Doubleday might have confirmed Puche's accounts by verifying facts with Hemingway's widow or with other persons present in Spain during the periods described in the book.

For purposes of opposing this motion, plaintiff contends that, at a minimum, Doubleday's failure to investigate under the circumstances presented here raises a question for the jury's determination whether Doubleday published the American edition with knowledge of or reckless disregard of the claimed falsity.

■ A factual issue exists as to whether defendant published its book with reckless disregard for the truth or falsity of its contents.

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts, shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

The exchange of memoranda between the Editor and other employees of Dou-

bleday and correspondence between the Editor and Puche could be construed by the triers of fact as evidencing an awareness by Doubleday that Puche intended to portray Hotchner in an unfavorable light. If the jury were to find the statements made false, then the jury might further find that, in light of their knowledge of Puche's low regard for Hotchner, Doubleday's employees were culpably reckless in not investigating further, or deleting the defamatory remarks.

■ A defendant in a defamation action cannot automatically escape liability by submitting affidavits which attest to the fact that the publication was made with a belief that the statements therein contained were true. "The finder of fact must determine whether the publication was indeed made in good faith." *St. Amant v. Thompson, supra*, at 732, 88 S.Ct. at 1326.

The issue of whether this publication was made with actual malice remains as a serious factual dispute which the jury must be permitted to determine. *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969); *Buckley v. Esquire, Inc.*, 344 F. Supp. 1133 (S.D.N.Y.1972). See also, *Sprouse v. Clay Communications, Inc.*, 211 S.E.2d 674, 689–90 (W.Va.Sup.Ct.), *cert. denied*, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975); *Time, Inc. v. Ragano*, 427 F.2d 219 (5th Cir. 1970).

### III

Doubleday contends that the plaintiff in a libel or invasion of privacy action must bear a special burden to withstand a defendant's motion for summary judgment, lest the burdens of litigation have a chilling effect on the exercise of the freedom of the press. Defendant relies heavily upon heroic language in *Meeropol v. Nizer*, 381 F.Supp. 29, 32 (S.D.N.Y.1974), stating:

"Summary judgment is particularly appropriate at an early stage in cases where claims of libel or invasion of privacy are made against publications dealing with matter of public interest

and concern. In recognition of the constitutional privilege of free expression secured by the First and Fourteenth Amendments, the courts in libel actions have recognized the need for affording summary relief to defendants in order to avoid the 'chilling effect' on freedom of speech and press. . . . Accordingly, the constitutional privilege mandates the granting of a motion for summary judgment as soon as it becomes clear that a plaintiff cannot establish the 'actual malice' required for recovery in defamation actions of this nature."

The last sentence quoted undercuts the very rule defendant would have us recognize. Saying that summary judgment is required where "it becomes clear that a plaintiff cannot establish . . . 'actual malice'," a requisite element in a claim of this nature, is the equivalent of a showing, in the precise words of Rule 56(c), F.R.Civ.P., that as to a necessary element of the claim there "is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In *Meeropol,* the Court held that, under the circumstances of that case, plaintiffs could not demonstrate actual malice as required under the *New York Times* standard.

Similarly, although the Court in *Grant v. Esquire, Inc.,* 367 F.Supp. 876, 881 (S.D.N.Y.1973) also stated that "plaintiff [in a defamation action] must make a more persuasive showing than required of an ordinary litigant in order to defeat a defense motion for summary judgment," the Court denied the motion in part because of the traditional considerations relied upon in denying summary judgment. The Court dismissed motion picture actor Cary Grant's libel claim because the publication on its face was not libelous, and "no amount of 'innuendo' " could make it such, but found that there existed issues of fact which made summary judgment inappropriate as to the plaintiff's claim under § 51 of the New York Civil Rights Law.

■■■ Principles applicable to summary judgment motions generally, are applicable to such motions when made in a defamation action. *Goldwater v. Ginzburg, supra; Time, Inc. v. Ragano, supra; Rinaldi v. Village Voice, Inc.,* 47 A.D.2d 180, 365 N.Y.S.2d 199 (1st Dept.), *cert. denied,* 423 U.S. 883, 96 S.Ct. 153, 46 L.Ed. 112 (1975); *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494, *cert. denied,* 883 U.S. 423, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975).

In *Goldwater, supra,* the Court found summary judgment to be inappropriate where "the non-moving party filed affidavits and relevant materials to show affirmatively that there was a genuine issue of fact for a trier of fact to resolve, the existence of [defendant's] possible actual malice." *Id.,* at 338 n. 21. See also *Buckley v. Esquire, Inc., supra.* See generally *Trails West, Inc. v. Wolff,* 32 N.Y.2d 221, 344 N.Y.S.2d 863, 298 N.E.2d 52 (1973); *Cole Fisher Rogow, Inc. v. Carl Ally, Inc.,* 29 A.D.2d 423, 288 N.Y.S.2d 556 (1st Dept. 1968), *aff'd mem.,* 25 N.Y.2d 943, 305 N.Y.S.2d 154, 252 N.E.2d 633 (1969). *Goldwater* further held that upon such a motion in a defamation case, as in all other actions, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Goldwater, supra,* 337 citing *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). See also *Time, Inc. v. Ragano, supra.*

■■■ Although summary judgment in a defamation action might serve the prophylactic function of sparing authors and publishers the chilling effect of litigation, "[t]his procedural weapon is a drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." *Heyman v. Commerce and Industry Insurance Company,* 524 F.2d 1317 (2d Cir. 1975).

■■■ As stated earlier, the Court finds that there exists a genuine issue as to a material fact, that is, whether

Doubleday published the allegedly defamatory passages in Puche's book in reckless disregard of whether the statements therein contained were true or false. It is beyond the province of this Court to resolve such a factual controversy upon affidavits, depositions and exhibits, and grant summary judgment. *Heyman v. Commerce and Industry Insurance Company, supra; Judge v. City of Buffalo,* 524 F.2d 1321 (2d Cir. 1975).

## CONCLUSION

Defendant Doubleday's motion for summary judgment is denied.

So ordered.