TERENCE M. O'NEIL, Respondent, v PEEKSKILL FACULTY ASSOCIATION et al., Appellants.

Second Department, October 14, 1986

**APPEARANCES OF COUNSEL**

*Wilson, Elser, Moskowitz, Edelman & Dicker (Marshal S. Endick* and *Ricki E. Roer* of counsel), for appellants.

*Botein Hays & Sklar (Richard Cashman, Daniel A. Ross* and *Judy H. Chin* of counsel), for respondent.

**OPINION OF THE COURT**

SPATT, J.

This appeal concerns the legal sufficiency of a libel action based on the allegation that the plaintiff made a "racial slur" during the heat of labor negotiations.

On the evening of March 16, 1983, after some 11 months of contract negotiations between the Peekskill School District (hereinafter the school district) and the defendant Peekskill Faculty Association (hereinafter the association) an impasse was reached. Representing the school district were the plaintiff Terence O'Neil, a labor lawyer and its chief negotiator, and Marguerite Kronheim, the school district's coordinator of special services. Present on behalf of the association were the individual defendants, Donald Pierce, a field representative for New York State United Teachers, the association's parent union; Stuart Friedman, a teacher employed by the school district and chief negotiator for the association; Steven Rose, a teacher employed by the school district, president of the association and the only black person among the defendants; and Andrew Gauzza and Paul Hewel, a school district teacher and retired teacher, respectively, who are both members of the association's negotiating team.

After heated discussions over the issue of unused sick leave

for retiring teachers, Friedman announced that the association had made its final offer and that the school district could "take it or leave it", whereupon he and the entire association negotiating team left the room. The plaintiff and Kronheim remained in the room alone. After a few minutes, Steven Rose returned by himself. After a lengthy silence, the plaintiff said, "Is this it?" or, "Is this all?", and then, gesturing toward the door, said either, "Are you the token?" or, "What are you, the token?" The plaintiff and Rose then began discussing the sick leave issue again, to no avail. No harsh words were exchanged between the two men.

Rose then left the room, and Friedman and Gauzza returned for further negotiations, which proved unsuccessful. At this time, Rose mentioned the plaintiff's "token" remark to the other defendants. After Friedman and Gauzza left, Pierce entered the room and handed the plaintiff a note advising him to call Rose in the morning regarding the association's final offer.

That evening, Pierce spoke to two Board of Education members and told them that the plaintiff had made a racial slur during that evening's negotiations. Pierce also stated to one member that the association would not negotiate further with the plaintiff. Thereafter, Pierce called at least two school board members and requested a meeting regarding the "racial slur" incident but was turned down. It is noted that Rose himself talked to at least two of the same school board members on various occasions over the next few days and indicated that he was not convinced that the "token" comment by the plaintiff had been racially motivated.

The next day, following a meeting of the association's executive committee, it issued the following press release:

"NEGOTIATION NOTES

"Chief-negotiator * * * Stu Friedman issued the following statement to the Peekskill news media:

"Our bargaining team left the table last night at 9:16 PM even though we were close to resolving the Retiring Teachers' Compensation problem.

"HOWEVER, A FEW MINUTES BEFORE OUR DEPARTURE, OUR PRESIDENT, STEVE ROSE WENT IN, ALONE TO SPEAK TO MR. O'NEIL AND FINALIZE THE AGREEMENT. MR. O'NEIL SAID: 'I HAVE HEARD OF TOKENISM BEFORE BUT THIS IS THE FIRST TIME I HAVE SEEN IT IN NEGOTIATIONS.'

"Mr. Rose returned to our caucus room and reported this

reprehensible racial slur to the entire team—the entire team (Mr. Friedman, Mr. Rose, Mr. Gauzza, Mr. Hewel and Mr. Pierce) left in anger. Mr. Friedman said, 'We put up with plenty of insults from Mr. O'Niel *[sic]* since November but this is one we are not taking from him or anyone else.' 'We will report this to the proper authorities.' Mr. Friedman said further.

"Team Members responded as follows; Mr. Hewel, 'What was said is contrary to all my beliefs.'

"Mr. Gauzza, 'I can not in good conscience sit at the bargaining table and listen to bigotry.'

"Mr. Pierce, 'There isn't really much to say. Mr. O'Neil's remarks speak for themselves and the firm he represents. In my twenty years as a Union Rep, I've never bargained with anyone with such nerve or unmitigated gall to use this kind of language at the bargaining table. It is an affront to the entire Union and the entire community of Peekskill.'

"Mr. Rose, 'At first I was somewhat stunned by Mr. O'Neil's remarks. And as I thought about it further, Mr. O'Neil's remarks only reflect his insensitivity and lack of concern for this District, and Community. We have been facing an outsider, who is suppose *[sic]* to be a professional. What he really is saying is that Mr. O'Niel *[sic]* doesn't give a damn for anyone or anything except his fee.' "

A story on this incident appeared in the *Peekskill Evening Star* on March 18, 1983. The opening paragraph stated, "Peekskill Faculty Association negotiators walked out of contract talks Wednesday night when, they say, a 'racial slur' was made by school district attorney Terence O'Neil to PFA president Steve Rose, a black Peekskill Middle School teacher". The article went on to report that the association's executive committee had called for O'Neil's ouster as chief district negotiator, and quoted Pierce as saying that he would not negotiate with O'Neil until the matter was straightened out. The story also quoted Rose as stating that it was "conceivable" that the remark was not racially motivated, and that he did not think O'Neil realized the impact of his words. Reports of the "incident" were also broadcast on local radio stations.

Two further association press releases, dated March 20 and 21, respectively, were subsequently issued to the public, both of which discussed the racial "incident" and the "crisis" it had precipitated. On March 31, 1983, a group of some 40 to 50 persons organized by the association picketed the plaintiff's

Long Island offices, carrying signs demanding his ouster as chief negotiator for the school district.

Meanwhile, on March 25, 1983, the school district had filed an improper practice charge with the Public Employment Relations Board (hereinafter PERB), alleging, in effect, that the association had used the "racial slur" incident as an excuse to (1) pressure the school district to drop the plaintiff as its negotiator, (2) obtain bargaining concessions, (3) refuse to negotiate with the plaintiff, and (4) negotiate directly with Board of Education members. After hearings held in July and October 1983, the Administrative Law Judge in February 1984 issued a decision substantially in favor of the school district (17 PERB ¶ 4523 [1984]). Excerpts from the PERB hearing testimony are included in the record on appeal.

On or about March 6, 1984, the plaintiff commenced the instant libel action seeking damages of $1,500,000. The complaint alleged that the plaintiff was defamed by reason of the defendants (1) ascribing to him a statement ("I have heard of tokenism before but this is the first time I have seen it in negotiations") that he never made, (2) falsely stating that he had made a "racial slur", (3) falsely asserting that such statement caused the defendants to immediately walk out of negotiations, even though agreement was near, (4) fabricating and publishing supposed statements of "outrage" at the plaintiff's remarks, and (5) falsely depicting the statement as causing a breakdown in negotiations that were purportedly on the verge of successful completion. The defendants' answer consisted of general denials and pleaded truth as an affirmative defense.

By notice of motion dated January 21, 1985, the defendants moved for summary judgment dismissing the complaint. The accompanying papers consisted of an attorney's affirmation in which it was argued, essentially, that the defendants' statements were substantially true and/or constitutionally protected opinions, and that the publications were protected by a qualified privilege. Also attached were excerpts from the plaintiff's response to interrogatories and a portion of Kronheim's PERB testimony. No affidavits by anyone with personal knowledge of the facts were submitted in support of the motion.

By notice of cross motion dated April 23, 1985, the plaintiff moved for an order pursuant to CPLR 3212 (g) limiting the issues for trial by deeming certain facts established. Special

Term denied the defendants' motion for summary judgment and granted the plaintiff's cross motion to the extent that it deemed the following facts to be established since the defendants "failed to submit contrary affidavits or specifically deny these facts":

(1) The plaintiff never made the statement which defendants attributed to him in the first press release ("I have heard of tokenism before but this is the first time I have seen it in negotiations");

(2) The first press release falsely reported that the school district and the faculty association were close to an agreement on the issue of sick pay then being negotiated between them when the defendant Steven Rose approached the plaintiff. In fact, both parties were deadlocked;

(3) The first press release falsely stated that Rose returned to the union caucus room and advised the other members of "this reprehensible racial slur" which caused the "entire team" to leave in "anger"; and

(4) The "quotes" in the first press release supposedly expressing outrage at O'Neil's alleged racial slur were never said that evening by any of the individual defendants present at the March 16, 1983, negotiation session.

In seeking summary judgment, the defendants contend: (1) that the published statement attributed to the plaintiff was substantially true, (2) that a qualified privilege extends to statements made by the defendants due to the context (labor negotiations) in which the publications occurred, and (3) that the defendants' statements were constitutionally protected opinions. Implicit in the defendants' motion for summary judgment is the additional issue of whether the plaintiff is a public figure.

A primary defense relied upon by the defendants is that the statement attributed to the plaintiff is substantially the same as that which the plaintiff admits to having made (see, Fleckenstein v Friedman, 266 NY 19). The admitted statement, "Are you the token?" spoken while the plaintiff gestured to the door beyond which were the other members of the negotiating team, leaves an open question as to whether any racially derogatory meaning was intended. However, the published statement, "I have heard of tokenism before but this is the first time I have seen it in negotiations", leaves little doubt as to its negative racial connotation. Further, the false statement was published with allegedly fabricated statements of "out-

rage" including charges of a "reprehensible racial slur" and "bigotry". It, therefore, cannot be said as a matter of law that the published version of plaintiff's remark would not have "a different effect on the mind of the reader from that which the pleaded truth would have produced" *(Fleckenstein v Friedman, supra,* at p 23). Rather, this is a question of fact to be determined at trial.

The defendants' second contention is that a qualified privilege extends to the statements made by the defendants while in the midst of labor negotiations. We agree and hold that the defendants are entitled to the protection afforded by "qualified privilege" status on the ground that the allegedly libelous statements were made in the course of labor negotiations.

Under New York law, where there is no dispute as to the facts, the determination as to whether a qualified privilege exists is one for the court and not the jury *(Klein v McGauley,* 29 AD2d 418; *Duffy v Kipers,* 26 AD2d 127; *Hotchner v Castillo-Puche,* 404 F Supp 1041; Restatement [Second] of Torts § 619, at 316; 2 Seelman, Libel & Slander in the State of New York § 592, at 729).

Where either party to a labor dispute circulates false and defamatory statements during the course of labor negotiations, a qualified privilege attaches *(see, Letter Carriers v Austin,* 418 US 264; *Linn v Plant Guard Workers,* 383 US 53). The Supreme Court grounded these decisions on Federal labor policies favoring "robust debate" *(Letter Carriers v Austin, supra,* at p 275) during the course of labor disputes, which quite often gives rise to "intemperate, abusive, or insulting language". This qualified privilege arising from labor negotiations does not, however, give "either party license to injure the other intentionally by circulating defamatory * * * material known to be false" *(Linn v Plant Guard Workers, supra,* at p 61). In the case of such a defamatory and malicious publication, the plaintiff may recover the damages recognized by State tort law *(Linn v Plant Guard Workers, supra,* at p 65). In *Thomas v Flavin* (58 AD2d 1031, 1032), the rule was succinctly stated, as follows: "State libel actions for statements issued during the course of, and arising out of, labor disputes have been pre-empted by Federal law. *(Linn v Plant Guard Workers,* 383 US 53.) The only instances in which State remedies are available are those in which the statements are circulated with knowledge of their falsity or with reckless disregard of whether they are true or false *(Linn, supra,* p 65.)"

In sum, the defendants are entitled to a qualified privilege on the ground that the alleged defamatory incident is one directly involved in labor negotiations. The result of extending such a qualified privilege to the defendants is that the plaintiff would have to show, by clear and convincing proof, that the published statements, in addition to being false and defamatory, were made with "actual malice"; that is, with knowledge of their falsity or with reckless disregard of their truth or falsity *(see, New York Times Co. v Sullivan,* 376 US 254; *Linn v Plant Guard Workers, supra; Thomas v Flavin, supra).* Since a qualified privilege attaches to the defendants' actions, the plaintiff, in the face of the defendants' motion for summary judgment, was required to come forward with sufficient proof of malice, in evidentiary form, to raise a triable issue of fact. *(Pace v Rebore,* 107 AD2d 30, 33, *appeal dismissed* 67 NY2d 647.) The plaintiff met this burden.

Actual malice involves a determination of the state of mind of a defendant and is thus not an issue that easily lends itself to summary disposition *(Hollander v Long Is. Plastic Surgical Group,* 104 AD2d 357). In our view, an issue of fact exists based on the submitted papers, namely, whether the defendants issued the first press release accusing the plaintiff of a "reprehensible racial slur" and "bigotry" knowing that its contents were false. This is sufficient to raise a triable issue as to the defendants' actual malice *(see, Hollander v Long Is. Plastic Surgical Group, supra; Di Lorenzo v New York News,* 81 AD2d 844; *Schermerhorn v Rosenberg,* 73 AD2d 276). The manner in which the defendants appear to have attempted to use the published statements to gain an advantage in the labor negotiations also buttresses the conclusion that a question of actual malice is presented. Moreover, although the plaintiff's statement was made while he was acting in his capacity as chief negotiator, the accusation of bigotry conveyed by the published version of the events constituted an attack on his personal and professional character in addition to his role as labor negotiator.

We now turn to the issue of whether the plaintiff is a public figure and, in doing so, must ascertain, preliminarily, whether the court or the finder of the facts makes this determination. There is authority that where the facts are not in dispute, the issue of whether a plaintiff, in a defamation action, is a public figure is one for the court to determine *(see, Rosenblatt v Baer,* 383 US 75; *Dattner v Pokoik,* 81 AD2d 572, *appeal dismissed* 54 NY2d 750; *Marcone v Penthouse Intl. Mag. For Men,* 754

F2d 1072, 1081, *cert denied* — US —, 106 S Ct 182, *reh denied* — US —, 106 S Ct 548; Prosser and Keeton, Torts § 115, at 835-836 [5th ed 1984]). However, in *Maule v NYM Corp.* (54 NY2d 880), the Court of Appeals, holding the plaintiff in that case to be a public figure, left open the question of whether a plaintiff's status as a public figure should be determined by the court or by the jury, or both *(see, Maule v NYM Corp., supra,* at pp 881-882, n; *see also, New York Testament Missionary Fellowship v Dutton & Co.,* 112 AD2d 55; *Arrigoni v Velella,* 110 AD2d 601). It is safe to assume, however, that, as in *Maule,* if the facts are not in dispute and sufficiently set forth in the papers, a public figure determination should be made by the court, as a matter of law.

In our analysis as to whether the plaintiff is a "public figure", we first note that a person may achieve such fame and notoriety so as to be a "public figure" for all purposes. The plaintiff in this case does not come within that category. In the second delineation of a public figure, a private person who is normally not a public figure may become one in a particular factual situation. This limited purpose public figure status may exist where "an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues" *(Gertz v Robert Welch, Inc.,* 418 US 323, 351).

This case presents the difficult issue of whether an attorney representing a school district as chief negotiator in a labor dispute is a limited purpose public figure. "Legal representation of a client, by itself, does not establish an individual as a public figure. To hold otherwise would place an undue burden on attorneys who represent famous or notorious clients" *(Marcone v Penthouse Intl. Mag. For Men, supra,* at p 1085). Mere representation of a public entity such as a school district, without more, does not render an attorney a limited purpose public figure. However, due to the inadequacy of the record before us, we cannot determine this issue at this stage.

A review of the case law addressing the issue of attorneys as limited purpose public figures reveals that more than mere representation of a school district would be required to cast the attorney in the role of a limited purpose public figure *(see, Gertz v Robert Welch, Inc., supra* [a prominent attorney who brought a civil suit against a police officer for the wrongful death of a young man was not a public figure]; *Frink v McEldowney,* 36 AD2d 536, *affd* 29 NY2d 720 [attorney employed by a town to render legal opinions on matters affecting

town and community interest involved in garbage disposal site dispute held to be a limited purpose public figure]; *Pace v Rebore,* 107 AD2d 30, *supra* [prominent local attorney who was brother of the chairman of the Town of Islip Republican Committee and in numerous matters of public interest and controversy prior to the lawsuit held to be a limited purpose public figure]; *Gilberg v Goffi,* 21 AD2d 517, *affd* 15 NY2d 1023 [attorney who was a partner in a law firm with the Mayor of the City of Mount Vernon and "entered the fray" of a conflict of interest issue involving the law firm raised in a political campaign held to be a public figure]; *see, Hotchner v Castillo-Puche,* 404 F Supp 1041, 1044, n 2, *supra).*

In *Marcone v Penthouse Intl. Mag. For Men (supra),* an attorney who voluntarily associated with notorious motorcycle gangs and engaged in nonrepresentational activities with the gangs which attracted intense media coverage was held to be a limited purpose public figure. The Third Circuit discussed the factors it relied upon, as follows: "Of course, if an attorney does more than merely represent the client in a strictly legal context—such as holding news conferences or otherwise affirmatively making a public issue of the case—then those activities may be counted in the public figure calculus. *See, e.g., Ratner v. Young,* 465 F.Supp. 386, 399-400 (D.V.I. 1979) (defense attorneys in widely publicized trial deemed public figures because of their out of court activities); *see also Woy v. Turner,* 573 F.Supp. 35 (N.D.Ga. 1983) (sports agent who uses media to promote his clients and himself is a limited purpose public figure). Nothing in the record of the present case indicates that Marcone was engaged in bringing attention to his clients or himself in regard to their legal relationship. Thus we may give only limited significance to Marcone's representational activities in the public figure analysis" *(Marcone v Penthouse Intl. Mag. For Men, supra,* at p 1086).

The record before us is devoid of evidence of the extent of the plaintiff's involvement, if any, with the public and the news media during the course of the negotiations. Despite his position as chief negotiator for the school district, we cannot determine his status without a greater exploration of the facts as to his public actions.

The defendants further contend that the statements under attack were constitutionally protected opinions. A review of the March 17, 1983 press release issued by the association reveals two allegedly defamatory statements which are each in the form of an "opinion". They are the characterizations of

plaintiff's alleged statement as a "reprehensible racial slur" and as an expression of "bigotry". In our view, these utterances are classic examples of pure opinions contained within a background of expressed supportive facts.

We note that the defendants nowhere contend that the individual defendants actually made the statements of "outrage" contained in the first press release. The defendants instead assert that these statements are merely "opinions" protected from the law of defamation.

Opinions are, of course, constitutionally protected and may not be the subject of a defamation action, provided that the facts supporting the opinions are set forth *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 380-381, *cert denied* 434 US 969). In *Silsdorf v Levine* (59 NY2d 8, 13, 15, *cert denied* 464 US 831), it was clearly stated that "the immunity afforded the expression of opinion obtains only when the facts supporting the opinion are set forth" and that the "plaintiff may be able to establish entitlement to recover damages for the defamatory opinions, assuming, of course, that he is able to demonstrate the falsity of the letter's statements of fact".

In this case, the subject press release does contain the facts purporting to support the opinions of "reprehensible racial slur" and of "bigotry". Under the unique circumstances of this case, Special Term has properly made findings, pursuant to CPLR 3212 (g), that virtually all of the supporting facts are false. If the facts set forth in support of the opinions are false, the statements of the opinions are actionable *(see, Silsdorf v Levine, supra; Greenberg v CBS, Inc.,* 69 AD2d 693; *Mr. Chow of N. Y. v Ste. Jour Azur S. A.,* 759 F2d 219; *Hotchner v Castillo-Puche,* 551 F2d 910, *supra).*

Since all of the pertinent published statements of fact upon which the opinions of "bigotry" and "reprehensible racial slur" are deemed to be false for all purposes, summary judgment on behalf of the defendants is precluded. As to the opinion defense, among the triable issues left for resolution is whether the false supporting facts underlying the opinions were published with "actual malice" *(see, Hotchner v Castillo-Puche, supra,* at p 913; *Kapiloff v Dunn,* 27 Md App 514, 343 A2d 251, 263, *cert denied* 426 US 907).*

---

* For an interesting array of views as to the application of actual malice rather than common-law malice in regard to an opinion defense, see the following commentaries: Sack, Libel, Slander, and Related Problems, at 178-183 (1980); Note, *Fact and Opinion After Gertz v. Robert Welch, Inc.: The*

With regard to the plaintiff's cross motion to deem certain facts established, the defendants submitted no affidavits by persons with personal knowledge of the facts either in support of their motion for summary judgment or in opposition to the plaintiff's cross motion pursuant to CPLR 3212 (g) to limit the issues of fact for trial *(see, Vermette v Kenworth Truck Co.,* 68 NY2d 714; *Zuckerman v City of New York,* 49 NY2d 557, 562), and challenge only one of the four factual allegations deemed admitted by Special Term. Even as to the sole factual allegation disputed, the testimony relied upon by the defendants in support of their contention that the parties had been close to an agreement at the time of the alleged incident does not fairly lend itself to such a conclusion. Special Term thus did not err in deeming all four factual allegations established for all purposes in this action.

Special Term properly denied the defendants' motion for summary judgment and granted the plaintiff's cross motion to deem certain facts established.

Accordingly, the order should be affirmed insofar as appealed from, with costs.

NIEHOFF, J. P., RUBIN and KUNZEMAN, JJ., concur.

Ordered that the order of the Supreme Court, Nassau County, dated July 2, 1985, is affirmed insofar as appealed from, with costs.

*Evolution of a Privilege,* 34 Rutgers L Rev 81, 102; Hill, *Defamation and Privacy under the First Amendment,* 76 Colum L Rev 1205, 1245, 1238, n 152; *see also, Mashburn v Collin,* 355 So 2d 879 [La], *in conjunction with* Sack *op. cit.,* at 182, n 144. For a discussion of the relationship between actual malice and the elements of "common-law malice", *see, Di Lorenzo v New York News,* 81 AD2d 844; *Goldwater v Ginzburg,* 414 F2d 324, *cert denied* 396 US 1049, *reh denied* 397 US 978; *Cochran v Indianapolis Newspapers,* 175 Ind App 548, 372 NE2d 1211; *see also,* Kaufman, *Press, Privacy and Malice: Reflections on New York v. Sullivan,* July 1984 NY St BJ 10.