**ROSE**

v.

**INDIANAPOLIS NEWSPAPERS, Inc.**

No. 11007.

United States Court of Appeals
Seventh Circuit.

May 21, 1954.

Eugene M. Fife, Jr., Indianapolis, Ind.. Ira L. Haymaker, James D. Acher, Haymaker & Acher, Franklin, Ind., for appellant.

Hubert Hickam, Jerry P. Belknap, Raymond W. Gray, Jr., Indianapolis, Ind., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel, for appellee.

Before MAJOR, Chief Judge, and LINDLEY and SCHNACKENBERG, Circuit Judges.

LINDLEY, Circuit Judge.

In her complaint in the District Court, plaintiff sought to recover damages from defendants, publishers of the Indianapolis Star, on the charge that the newspaper had, in a certain news article, of December 30, 1952, libeled her, in that it had falsely reported that plaintiff did on December 27, 1952, "slay, kill and murder her husband," and that the State Police and United States Camp Atterbury authorities "did suppress" the news of the event for two days. These statements were charged to be defamatory, for the reason, as plaintiff said, that she did not "slay, kill or murder" her husband, and there had been no suppression of news as reported. Plaintiff averred that she had suffered damage to her good name but asserted no claim for special damages.

The article, as set forth in the complaint, bore a headline, "Atterbury G.I. Slain By War Bride," followed by a subheading, "News Kept Concealed Two Days" and this by a further smaller subheading, "Army Suppression, Police Failure to Report Under Probe." Accompanying the publication was a pic-

ture of plaintiff, above which appeared the heading, "Bride Quizzed." The article reported that neither the military authorities nor the state police had made any report of the matter, though two days had elapsed and clearly intimated that this failure to make the facts public was suspicious. However, it did not report, and its language is not susceptible of any implication of intention to report, that plaintiff had had anything to do with the alleged suppression of the news.

In so far as plaintiff was concerned, the publication related that plaintiff and her husband, a sergeant, had been entertaining another soldier, Corporal Puckett, and his wife; that Puckett had brought to their trailer, near the U. S. Military Camp where both soldiers were stationed, a .32 caliber revolver which he proposed to sell to Rose; that Mrs. Rose, the plaintiff, examined the pistol, inquired how it worked and asked "if I pull the trigger will it shoot"; that she did pull the trigger, whereupon her husband fell to the floor; that she then screamed "get a doctor" and, becoming hysterical and unable to answer police questions, was taken to Camp Atterbury Hospital and there treated for shock; that a verdict in the coroner's inquest would be withheld, pending further investigation, and that, ostensibly, police and military authorities had asked that no release of the news be made pending outcome of their attempt to determine the detailed facts surrounding the shooting.

In their answer defendants denied that the article was untrue or libelous. They averred that they had reported only the true circumstances, in so far as plaintiff was involved, and had fairly and accurately stated the facts; that the news item contained only fairly reported factual statements; that the coroner's verdict had discharged plaintiff on January 12, 1953 upon a finding that the death of her husband had occurred by reason of "accidental means when shot accidentally by a revolver in the hands of his wife"; that the facts, as stated by plaintiff herself before the coroner, were that, after the gun was brought into the house, it was handed to her; that she had it in her hand only for a second; that she thought it was a "play gun" such as her little brother had wanted and she had looked for in the stores in Indianapolis; that she did not know the gun was loaded and did not know just what had happened. A transcript of her evidence and that of Puckett and his wife were made part of the answer. Mrs. Puckett said that when she and her husband first arrived, plaintiff was in another room fixing her hair; that Sergeant Rose asked her to come into the room and "be introduced" to the callers and that when she entered and was handed the gun she asked if it would shoot and her husband said it would, "if you pull the trigger," and that the next thing the witness knew, the sergeant fell to the floor. Plaintiff did not deny or refute any of the evidentiary facts thus presented by defendants.

In this situation the precise question presented to the trial court was whether, upon motion for summary judgment, the court was justified in entering such a judgment, i. e., whether, upon the face of the record, there remained any substantial question of fact which should have been submitted to a jury.

It appears that the news report was, in its essence, in full accord with what actually happened at the time plaintiff's husband was slain. The undisputed fact is that plaintiff accidentally shot him. Our question, then, is whether the article, when considered as a whole, went beyond this actual fact and necessarily implied additionally, upon the part of the plaintiff, wrongful conduct over and beyond that of accidental shooting. Scanning the record, we find nothing other than a true report of the shooting. True, the headline asserted that Rose had been "slain" and it is said by plaintiff that such a term carries ordinarily a connotation of unlawful violence on the part of the killer. True it is also that the subheadlines asserted that the news had been suppressed for two days and that

the facts were under investigation. It is said that in all this there was a necessary implication that plaintiff had been guilty of improper action in causing suppression of the news. However, it is perfectly obvious that the article did not charge and in fact did not imply that plaintiff was in any way a party to or responsible for any suppression of the news. Indeed, the plain implication of the news story is that the authorities, for some purpose of their own, had suppressed the news until further investigation could be completed and that the news article, so far as plaintiff was concerned, disclosed, almost in her own words, what had actually happened at the time of the shooting. The report, taken as a whole, carried no charge or implication other than that of accidental shooting, and the facts narrated were later borne out by plaintiff's own testimony and the verdict of the coroner's jury. We think the court rightfully held, on the undisputed facts, that the publication included only an essentially true statement of what had occurred at the time plaintiff shot and killed her husband.

■■ In reaching this conclusion, we have borne in mind, as we must, in determining whether it goes beyond a substantially true statement of the facts, that the whole of the publication must be considered. The fallacy in plaintiff's argument is that it conflicts with this cardinal rule of the law of libel, which "flatly prohibits" any attempt to wrench a word or a phrase of an article out of context and base an action thereon. The whole of the reported article must be considered in determining whether it is actionable and whether it transcends a substantially true statement of the facts. 53 C.J.S., Libel and Slander, § 10; Estill v. Hearst Pub. Co., 7 Cir., 186 F.2d 1017, 1021. We conclude, therefore, from a consideration of the whole of the publication, that there is nothing to justify a finding or an inference that the reporter exceeded a substantially true statement of the facts. The essential truth of a news report is always a defense to an action for libel. 53 C.J.S.,

Libel and Slander, § 122; Walford v. Herald Printing & Publishing Co., 133 Ind. 372, 375, 32 N.E. 929, 930; Heuer v. Kee, 15 Cal.App.2d 710, 59 P.2d 1063, 1064–5; State Journal Co. v. Redding, 175 Ky. 388, 194 S.W. 301, 303. Obviously if the report, admitted to be true by plaintiff's failure to controvert the factual averments made by defendants, was true, it matters not what it reported. It follows that the trial court was not justified in doing other than allow the motion for summary judgment.

■■ If it were admitted *arguendo* that ambiguity was inherent in the wording of the headlines and in the article itself and that it was, therefore, for a jury to determine whether there was an implication of a charge of something more than accidental shooting, the complaint is still fatally defective, for if such were the case plaintiff was bound to aver and prove special damages. Brewer v. Hearst Pub. Co., 7 Cir., 185 F.2d 846, 850. The same rule controls in Indiana, by the law of which we are bound. Cosand v. Lee, 11 Ind.App. 511 at pages 514–515, 38 N.E. 1099. True the cited case involved slander but, though there are distinctions between libel and slander in some respects, we know of no basis for any distinction between them in determining what it is necessary to aver in order to establish liability for words not actionable *per se*. See also Floyd v. Fordyce, 53 Ind.App. 449, 101 N.E. 825; Patton v. Jacobs, 118 Ind.App. 358, 78 N.E.2d 789.

■ Plaintiff insists, as we have noted, that the publication necessarily implied that plaintiff was responsible for, or contributed to, the suppression of the news for some two days. We do not think such interpretation of the article is justified. But, even were it a reasonable construction, again the rule requiring a claim for special damages for words not libelous *per se* would prevent plaintiff's recovery upon the complaint presented. However, we think it beyond question that the article upon a fair reading contains no implication of par-

ticipation by plaintiff in or of her responsibility for the alleged suppression. Of course, she cannot support a charge of libel of herself by showing that in the publication of which she complains third persons were defamed. Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 132 S.W. 1143, 1147; 53 C.J.S., Libel and Slander, § 145. The judgment is

Affirmed.