JUNE COCHRAN AND MADELINE DALEY *v.* INDIANAPOLIS NEWSPAPERS, INC., HARLEY R. BIERCE, WILLIAM E. ANDERSON AND RICHARD E. CADY

[No. 2-676A210. Filed February 27, 1978. Rehearing denied May 8, 1978. Transfer denied November 10, 1978.]

*Raymond F. Fairchild,* of Indianapolis, for appellants.

*Thomas M. Scanlon, Raymond W. Gray, Jr., Robert P. Johnstone, Barnes, Hickam, Pantzer & Boyd,* of Indianapolis, for appellees.

SULLIVAN, P.J. — The *Indianapolis Star,* owned and operated by Indianapolis Newspapers, Inc., published two articles authored by Harley Bierce, William Anderson and Richard Cady. These articles concerned certain alleged activities of and statements by plaintiffs June Cochran and Madeline Daly.

Cochran and Daly filed a libel complaint. Cochran sought damages in the amount of $1,250,000 against Indianapolis Newspapers, Inc. and the three reporters. Daly sought $300,000 against the same defendants. Defendants filed their answer asserting that the articles were not defamatory and, in the alternative, that there was a qualified constitutional privilege. Thereafter the trial court granted defendants' motion for summary judgment, setting forth the following reasons:

"(1) This is a libel action based upon statements which appeared in newspaper articles and photographs prepared by the

individual defendants and published by defendant Indianapolis Newspapers, Inc.

(2) June Cochran is a public figure and the statements and photographs in the articles relating to her involved matters of general and public interest. The statements and photographs in the articles relating to Madeline Daly involved matters of general and public interest.

(3) Under the First Amendment to the United States Constitution and Article I, Section 9 of the Indiana Constitution, the publications about plaintiffs are actionable only upon a showing that they were published by defendants with actual malice — that is, with knowledge that they were false or with reckless disregard of the probable falsity of them.

(4) The record shows that there are no facts which would establish or tend to establish actual malice by defendants in preparing or publishing the statements and photographs about plaintiffs."

The articles in question were the result of an ongoing investigation by the three reporters concerning alleged police and prosecutorial corruption in Indianapolis. The first article, appearing on November 9, 1973, reported on the refusal of the Marion County Prosecutor's Office to issue a warrant requested by the Marion County Sheriff's Department. The warrant was sought for the apprehension of Harold Lee Lloyd, a fugitive, on charges of burglary and violation of a firearms statute.

Background information in the article revealed that Lloyd was the half-brother of co-plaintiff June Cochran and the son of co-plaintiff Madeline Daly. Cochran had been a "Playmate" for Playboy Magazine and was more recently "Miss Hurst Golden Shifter" at the Indianapolis '500' auto race.

The article stated that the prosecutor's office based its refusal to grant the warrant on the fact that Lloyd had been previously acquitted by a jury on similar charges, therefore rendering useless any further attempts to prosecute him. The article observed, however, that Cochran testified on behalf of her brother at the earlier trial wearing "provocative attire." It was also noted that both a deputy sheriff and a bondswoman who provided bail for Lloyd's release stated that Daly told them she had "political

connections" and that she knew a "lot of very important people who would assist her in protecting Lloyd."

The second article appeared on November 10, 1973. The headline stated:

"Pearcy Takes Personal Control of Grand Jury in Brothel Quiz"

An explanatory caption printed in bold letters read:

"(This story is part of a continuing investigation by reporters William E. Anderson, Harley R. Bierce and Richard E. Cady into illegal sex activities.)"

The article included a picture of Cochran and Daly with the caption:

"Ex-Bunny, Mom Meet Pearcy"

The article commenced with an account of the Chief Prosecutor's decision to take personal control of the grand jury which was investigating charges of bribery involving police and members of the prosecutor's staff. Specifically, the bribery charges concerned alleged payoffs by, and protection of, a local brothel.

Approximately a third of the way into the article, the subject shifted to the Chief Prosecutor's comment that he would recommend the grand jury hear testimony from Cochran and Daly. It was noted that Cochran and Daly charged that they were harassed by the Sheriff's office, and that they stated they would make complaints about this harassment to the grand jury. The article repeated the allegations previously printed in the November 9 article that Daly stated she had political connections and knew a lot of people. The article then renewed its discussion of the grand jury's probe into the charges of illegal sex activities and payoffs to police and public officials.

Cochran and Daly contend that the articles were the result of a systematic attempt by the three reporters, in concert with a deputy sheriff, to create an appearance of underhanded dealings and involvement in illegal sex activities in retaliation for their refusal to give information concerning Harold Lee Lloyd's whereabouts.

They specifically cite three alleged defamations:

(1) In the November 9 article, the implication that Daly had used "political connections" to prevent the issuance of the warrant;

(2) In the November 9 article, the statement that Cochran appeared at Lloyd's trial in "provocative attire," and;

(3) In the November 10 article, the implication that both Cochran and Daly were involved in "illegal sex activities."

I.

## ALLEGATION THAT STATEMENTS AND IMPLICATIONS WERE DEFAMATORY

A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Hotel and Restaurant Employees and Bartenders Intern. Union v. Zurzolo* (1968), 142 Ind. App. 242, 233 N.E.2d 784. A false imputation of criminal activity gives rise to a cause of action for defamation, but the imputation must bear some reasonably close relation to the legislative definition of a crime. *Gibson v. Kincaid* (1966), 140 Ind. App. 186, 221 N.E.2d 834.

A statement that one has "political connections" and knows a lot of "prominent local officials who can keep her son out of prison," when placed in the context suggesting that such advantages have in fact led to illegal activities, is defamatory. In the case before us, the possible implication of the statement was that Daly had used these "connections" in the prosecutor's office to effect the criminal act of impeding the issuance of a warrant. *See* I.C. 35-1-97-1 (Burns Code Ed. 1975).

The statement that Cochran appeared at Lloyd's trial in "provocative attire", however, does not appear to be of such a nature that it would cause shame, ridicule and contempt, or that it would suggest incompatibility with her profession. On the contrary, such statement would seem to enhance the profession Cochran has chosen and the reputation she has voluntarily

promoted in her various appearances in magazines and celebrity events.

Finally, Cochran and Daly contend that the article of November 10 created an implication that they were involved in the "illegal sex activities" which were being investigated by the grand jury. It is argued that the inclusion of the story concerning their appearance before the grand jury to complain of police harrassment with the description of the brothel investigation was a calculated attempt to create a false impression in the mind of the average reader.

We note that whether an article or statement *could* possess a defamatory meaning or implication is initially a question of law for the trial court. *Henderson v. Evansville Press, Inc.* (1957), 127 Ind. App. 592, 142 N.E.2d 920. In *Hartmann v. American News Co.* (7th Cir. 1948), 171 F.2d 581, 584, it was conversely stated:

> "From the foregoing it is clear that the articles in question are susceptible to both a libelous and non-libelous meaning. In this regard a jury question is raised . . . . [I]f upon consideration of the articles as a whole there is ambiguity as to the alleged interpretation of the articles the issue is for the jury."

And in reviewing a grant a summary judgment for defendant, the court in *De Husson v. Hearst Corp.* (7th Cir. 1953), 204 F.2d 234, 238, said: "[W]e can only sustain the judgment of the trial court providing we can say as a matter of law that the newspaper article in question is incapable of conveying the meaning. . . ."

The compatibility of this view with Indiana law is evidenced by the following comment in Justice DeBruler's opinion in *Indianapolis Newspapers, Inc. v. Fields* (1970), 254 Ind. 219, 259 N.E.2d 651, 659:[1] "It was for the jury to determine if a reasonable reader using words in their ordinary sense would read the articles as implying the meanings alleged by appellee. *Logan v. Logan* (1881),

---

1. In the *Fields* case, the judgment of the trial court was affirmed by virtue of a 2-2 vote of the Supreme Court. Justice DeBruler wrote the affirming opinion and was joined by Justice Jackson. Justice Arterburn wrote the dissent and was joined by Justice Hunter. Justice Givan did not participate.

77 Ind. 558." In *Fields*, the defendant failed to challenge the interpretation of the article as claimed by plaintiff, in effect conceding that the articles were susceptible to such an interpretation. Where plaintiff's interpretation of an article is challenged, however, it is apparent that the trial court must determine as a matter of law whether an ambiguity exists and, if so, whether any of the reasonable interpretations arising therefrom could be taken as defamatory.

As we stated in *Rose v. Indianapolis Newspapers, Inc.* (7th Cir. 1954), 213 F.2d 227, 228 (interpreting Indiana law): "Our question, then, is whether the article, when considered as a whole, went beyond this actual fact and necessarily implied additionally, upon the part of plaintiff, wrongful conduct. . . ." Although the alleged implication was not found to exist, the court in *Rose* indicated that where an ambiguity was inherent in the headlines and the article, it was for the jury to determine whether in fact such an implication was understood. The court concluded that it was "perfectly obvious that the article did not charge and in fact did not imply that plaintiff was in any way responsible . . . ." 213 F.2d at 229.

In the case at bar, however, it is *not* perfectly obvious that the articles in question did not imply the alleged defamatory message. Such a determination necessitates that the whole of the publication be considered in establishing whether it is actionable and whether it transcends a substantially true statement of the facts. *Rose v. Indianapolis Newspapers, supra,* 213 F.2d at 229. The place and position of an item in a publication are to be considered, *see Estill v. Hearst Publishing Co.* (7th Cir. 1951), 186 F.2d 1017 (applying Indiana law); *see generally* 50 Am.Jur.2d Libel and Slander § 141, p. 643, as are the headlines of the article. *See Spanel v. Pegler* (7th Cir. 1947), 160 F.2d 619; *see generallly* 50 Am.Jur.2d Libel and Slander § 142, p. 644.

Furthermore, a defamatory charge does not have to be made in direct, positive language, but may be implied, *see Professional and Business Men's Life Ins. Co. v. Banker's Life Co.* (D. Mont. 1958), 163 F. Supp. 274, and language relied on as libelous must be

judged in light of facts known to those to whom it is addressed. *Klein v. Belle Alkali Co.* (4th Cir. 1956), 229 F.2d 658.

A false implication or impression may be created by the positioning of true statements and headlines, *see McNair v. Hearst Corporation* (9th Cir. 1974), 494 F.2d 1309,[2] and the defense of truth "must extend to the innuendo, the libelous implications and insinuations, as well as to the direct accusations in the statement." *Friday v. Official Detective Stories, Inc.* (E.D. Pa. 1964), 233 F. Supp. 1021, 1023; *see also McNair v. Hearst Corporation, supra;* 53 C.J.S. Libel and Slander § 137, p. 225.

If the article is capable of two meanings, one libelous and one not, the case should properly go to the jury. *See Estill v. Hearst Publishing Co., supra,* at 1020; *Gearhart v. WSAZ, Inc.* (E.D. Ky. 1958), 150 F. Supp. 98. In determining whether a defamatory meaning is possible, the test is the effect which the article is fairly calculated to produce and impression it would naturally engender in the mind of the average person. *MacRae v. Afro-American Co.* (E.D. Penn. 1959), 172 F. Supp. 184.

Analyzed under the foregoing standards, it is apparent that the November 10 article is capable of conveying a defamatory impression. The headline, as previously noted, reads: "Pearcy Takes Personal Control Of Grand Jury In *Brothel Quiz*" (emphasis supplied). Immediately the reader is given the impression that the "Brothel Quiz" is a central theme of the article.

The explanatory sub-caption strengthens this impression by stating that the story was part of a continuing investigation into "illegal sex activities". The article is accompanied by a single photograph of Cochran and Daly with the caption: "Ex-Bunny, Mom Meet Pearcy".

It would appear that the main import of the story was the investigation into the alleged bribery and protection involving a local brothel. Inserted into the article, however, is the item concerning

---

2.  In *McNair v. Hearst Corporation, supra,* the court held that the headlines and opening paragraphs of an article were constructed so as to convey an initial false and defamatory impression, even though information supplied in the latter part of the article might explain and correct the initial impression.

Daly and Cochran's appearance before the grand jury for a completely unrelated purpose.

The defendant reporters have contended that the inclusion of this sidelight concerning Daly and Cochran was wholly consistent with what they term the central topic of the article—the grand jury. It is quite reasonable to conclude, however, that the paramount interest in, and attraction of, the article was the investigation of the "illegal sex activities". The reporters further contend that the inclusion of somewhat disconnected items in one article to save space is standard journalistic practice. While this may be so, the article in question was not a typical news item. It was, and explicitly stated so, part of a "continuing investigation" into "illegal sex activities", giving it the appearance of being somewhat documentary in nature. In light of the position of the Daly-Cochran item, the headlines and the inclusion of the photograph, it is quite plausible that the average reader could receive the impression that Daly and Cochran were involved in the investigation of illicit sex activities. Therefore, both articles carried implications which were, as a matter of law, capable of a defamatory interpretation.

## II.

### QUALIFIED PRIVILEGE: THE INDIANA STANDARD

Indianapolis Newspapers, Inc. and defendant reporters argue that, notwithstanding the possible defamatory nature of the articles, they are nevertheless protected by a qualified constitutional privilege afforded to media expression concerning public figures and private individuals involved in matters of public interest.

It is well-established under the landmark case of *New York Times v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 170, that a "public official" must prove that a defamatory statement was made with "actual malice" in order to recover damages. In *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 87 S.Ct. 1975, this privilege was extended to media comments on matters of public interest concerning "public figures". *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 91 S.Ct. 1811, increased the scope of the privilege by emphasizing the "newsworthiness" of the statement, holding

that a private individual involved in a matter of public concern would also be required to prove "actual malice". Finally in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, the Supreme Court established that the "actual malice" standard applied constitutionally only to "public figures", not to private individuals involved in "newsworthy matters".

*Gertz*, however, left to the states the option of imposing the "actual malice" test for private individuals involved in matters of public interest and concern. A decision of the Third District of this Court incorporated the higher standard. *Aafco Heating and Air Conditioning Co. v. Northwest Publications, Inc.* (1975), 162 Ind. App. 671, 321 N.E.2d 580, (cert. den. 96 S.Ct. 1112). This test requires private persons involved in matters of public interest as well as public figures to prove "actual malice" in order to recover damages for a defamatory statement.[3]

### III.

### PUBLIC FIGURES AND PRIVATE CITIZENS IN MATTERS OF PUBLIC INTEREST

June Cochran was a "Playmate" appearing in Playboy Magazine and was also "Miss Hurst Golden Shifter" at the Indianapolis '500' auto race, an event of international interest. It is apparent that she satisfies the "public figure" requirement as set forth by the U.S. Supreme Court in *Curtis Publishing Co. v. Butts, supra,* as well as the Indiana definition of a person involved in matters of "general or public interest". See *Aafco, supra,* 321 N.E.2d at 586.

In *Aafco*, the court stated:

"[I]t seems clear that constitutional protection for speech and press was not intended to be limited to matters bearing only on

3. If the "actual malice" standard as to private individuals had not been previously adopted in the *Aafco* case, we might have used a different test. The denial of transfer by the Indiana Supreme Court and denial of certiorari by the United States Supreme Court, however, provide sufficient disincentive for us to enunciate an inconsistent viewpoint. See *Patten v. Smith* (1977), 172 Ind. App. 300, 360 N.E.2d 233.

issues of official conduct or the activities of pre-ordained or *de-facto* 'public figures'. Rather, we must conclude that the Indiana's constitutional mandate of freedom of the press was designed to advance " 'truth, science, morality and the arts in general as well as responsible government." ' *Curtis Publishing Co. v. Butts, supra,* 388 U.S. at 147, 87 S.Ct. at 1987, (Harlan, J. concurring opinion)." 321 N.E.2d at 586.

*Aafco* also established that the relative importance or stature of the individual involved in the issue is not material. The court quoted from *Rosenbloom v. Metromedia*:

" 'If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety.' 403 U.S. at 43, 91 S.Ct. at 1819." 321 N.E.2d at 586-587.

Daly, although admittedly a private individual, has nevertheless injected herself into matters of vital public concern by appearing voluntarily before the grand jury and by talking to the reporters concerning the activities of Harold Lee Lloyd.

Therefore, both Cochran and Daly must assume that burden of showing "actual malice" on the part of the defendants in publishing the arguably defamatory statements.

## IV.

## ACTUAL MALICE

The definition of "actual malice", as formulated in *New York Times, supra,* and as later refined in *St. Amant v. Thompson* (1968), 390 U.S. 727, 88 S.Ct. 1323, was set forth and discussed in *Aafco, supra*: "actual malice" will be found to exist where "the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of whether it was false." 321 N.E.2d at 586. "Actual malice" will also be found where there is shown an "intent to inflict harm through falsehood." *Henry v. Collins* (1965), 380 U.S. 356, 357, 85 S.Ct. 992, 993; *McCarney*

*v. Des Moines Register and Tribune Co.* (Iowa 1976), 239 N.W.2d 152.

The *St. Amant* decision further clarified what constitutes "reckless disregard" of a statement's probable falsity. It is not, the Court held, whether a reasonably prudent man would have published or would have investigated before publishing. The evidence must show that the defendant in fact entertained serious doubts as to the truth of the statement. 390 U.S. at 731; *See also Aafco, supra,* 321 N.E.2d at 589.

The requirement of showing knowledge of or serious doubts as to the falsity of a statement or implication, however, does not permit a publisher or reporter to simply create and print an allegation in the legal assurance that there is immunity from liability since one can never be proved to have been certain that the statement was not true. The *St. Amant* decision stated the proposition as follows:

> "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732, 88 S.Ct. at 1326.

Thus, evidence of lack of good faith in publishing or reporting a statement may be indicative of reckless disregard of the statement's or implication's probable falsity.

The defendants contend that evidence of "ill-will", including prior attempts at intentional falsification, is no longer material under the constitutional definition of "actual malice" as formulated by *New York Times* and its progeny. While "ill-will" is not an element of

the legal definition of "actual malice", *see New York Times v. Sullivan, supra; Garrison v. Louisiana* (1964), 379 U.S. 64, 85 S.Ct. 209, it is nevertheless relevant and admissible *as evidence* in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity. *See Indianapolis Newspapers, Inc. v. Fields, supra,* 259 N.E.2d at 664. Circumstantial evidence may also be relied upon to show "high degree of awareness of probable falsity." *Peagler v. Phoenix Newspapers, Inc.* (1976), 26 Ariz.App. 274, 547 P.2d 1074, 1082, vacated on other grounds, 114 Ariz. 309, 560 P.2d 1216.

In *Fields* it was stated:

"Appellant's argument is that ill will evidence is not *admissible* on the issue of whether appellant published with reckless disregard for the truth. We believe that it is relevant and admissible on that issue. It is true that ill will evidence does not tend to prove that appellant had *knowledge* of the falsity of its publications. However actual malice may consist in a 'high degree of awareness of their probable falsity'. *Garrison v. Louisiana, supra.*

Appellant's estimate of the probability of falsity of its publications was not derived with mathematical exactness from purely objective factors. It was certainly influenced by various considerations one of which might very well have been appellant's hatred for appellee. Ill will evidence might also tend to prove that appellant published in spite of its estimate of a probability of falsity." 259 N.E.2d at 664.

Numerous cases have affirmed that motive and intent may be adduced for the purpose of establishing by accumulation and by appropriate inference the fact of defendant's recklessness. *See Goldwater v. Ginzburg* (2d Cir. 1969), 414 F.2d 324; *Hotchner v. Castillo-Puche* (S.D. N.Y. 1975), 404 F. Supp. 1041; *Airlie Foundation, Inc. v. Evening Star Newspaper Co.* (D.D.C. 1972), 337 F. Supp. 421. It has also been noted that the "actual malice" test is concerned with the defendant's *attitude* towards the truth or falsity of the statement. *See Cantrell v. Forest City Publishing Co.* (1974), 419 U.S. 245, 95 S.Ct. 465; *Carson v. Allied News Co.* (7th Cir. 1976), 529 F.2d 206.

Furthermore, the court in *Oliver v. Village Voice, Inc.* (S.D. N.Y. 1976), 417 F. Supp. 235, 238, stated:

"To establish recklessness, it is not sufficient to show that the reporting in question was speculative or even sloppy. There must be 'an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' *Curtis Publishing Co. v. Butts* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967)."

Defendants contend that no facts have been adduced which could, under the foregoing standards, support a finding that there was actual knowledge of the falsity of the implications or reckless disregard thereof.

The depositions, affidavits and articles of record reveal matters which militate against the summary judgment granted. Defendants Bierce and Cady were with Deputy Sheriff Rodney Jones when the latter offered Daly immunity for Lloyd in return for information as to his whereabouts. Bierce reportedly said: "You'd better get on this boat while there is still room because there won't be any room later." Jones, in the presence of the reporters, stated: "Your daughter, June, has her pictures made with movie stars and is a celebrity and she is at the top of her career and you wouldn't want to see a nasty story spread across the newspapers and all of it go down the drain."

Jesse Fredrick, a friend of Lloyd's, stated that Jones questioned him in the presence of defendants Bierce and Anderson, also concerning Lloyd's whereabouts. Jones stated in the presence of the two reporters: "These two guys are from the newspapers. I told you I have some powerful friends who could either make or break a person." Jones also stated that he would "get" Lloyd's family where it "really hurts". Anderson added: "Publicity can make or break a person." Jones then asked Frederick if June Cochran had ever received any "hot" TV's. After Fredrick replied that he didn't know, Anderson said: "Well, it wouldn't hurt anything if you said that she did, whether she did or not."

Furthermore, the wording of the November 10 article wherein Daly was described as the "operator" of an antique shop, a word used

to describe a prominent figure in the brothel investigation, could arguably constitute evidence of possible intentional fabrication. The article also stated that the Chief Prosecutor had "asked all of these men to appear because they had some investigation or activity in connection with the Mary Martin probe." Notwithstanding the fact that Cochran and Daly are not "men", such statement in light of its context in the article is susceptible to ambiguity and could further confuse the reader and generate belief that Cochran and Daly were also appearing for that purpose.

With respect to the article of November 9, we are of the belief that, notwithstanding any possible attempt by the reporters to obtain false information against Cochran and Daly, the implication that plaintiffs may have prevented the issuance of a warrant through "political connections" was, in light of information presented to the reporters by named third persons, a reasonable one. The article stated that Daly had made the comments concerning "political connections" to third persons. Those third persons were named in the article, and depositions verify that those third persons indeed made the statements to the reporters. There is no evidence suggesting the existence of serious doubts in the minds of the reporters concerning the probable falsity of such an inference. Plaintiffs' allegations concerning the article of November 9 do not, therefore, provide any basis for recovery. We find no error in the granting of defendants' Motion for Summary Judgment with respect to the article of November 9, 1973.

The same cannot be said for the November 10 article. There are no facts or statements of record which even remotely support the implication that plaintiffs were engaged in "illegal sex activities". Here, then, evidence of ill-will and prior attempts at intentional falsification place in issue the possibility that the defendant-reporters did in fact possess serious doubts as to the probable falsity of the implication.

We re-emphasize that ill-will, including prior attempts to obtain false information, is not an *element* of the legal definition of actual  malice. It is, however, relevant as *evidence* showing a state of mind highly-susceptible to the entertainment of serious doubts concerning probable falsity.

In this connection, it is important to note the conceptual difficulties in applying the actual malice test for a defamatory implication or impression arising from the juxtaposition of essentially-true statements. An explicit and concrete statement is generally traceable to some source. The author or reporter cannot legitimately create from thin air what purports to be a statement of fact. Whether the author had actual knowledge of or reckless disregard for the falsity of such a statement can, in most instances, be readily determined by reviewing the source of and method used to obtain it.

An implication or impression, however, is a "created" statement flowing from the positioning of explicit statements. While it may or may not have been conceived in the head of the author, it is nevertheless born when the page is printed. Logic fails when one defamed by such a "created" statement is required to show knowledge of or reckless disregard for its falsity, when in fact it can rarely be proven that the author even knew of the implication.

As a result, the actual malice standard, as now applied, rewards a publisher or reporter for communicating a statement in a surreptitious and invidious manner by implication. This is especially repugnant where, as here, the implication creates an appearance of fact rather than of mere opinion. Such result defeats the very purpose of the recent protections afforded to media expression concerning public figures — free flow of information vital to responsible decision-making in a democratic society.

We are of the belief that where, as here, there is evidence of attempts by reporters to obtain false statements concerning a plaintiff, such evidence may indicate a lack of good faith, *see Indianapolis Newspapers, Inc. v. Fields, supra,* as well as an attitude disinclined toward the truth, *see Cantrell v. Forest City Publishing Co., supra,* and permits an inference of intent to harm through falsehood, *see Henry v. Collins, supra,* and is suggestive of a depature from responsible reporting as was contemplated in *Curtis Publishing Co. v. Butts, supra.*

Such matters, appearing of record, are sufficient to disclose the existence of genuine issues of material fact so as to preclude granting of a summary judgment for defendants.

## V.

## *SUMMARY JUDGMENT*

Finally, defendants appear to argue that a plaintiff in a libel action should bear a special burden of defeating a motion for summary judgment in order to prevent a possible chilling effect on the freedom of expression. They quote from *Wasserman v. Time, Inc.* (D.C. Cir. 1970), 424 F.2d 920, and *Bon Air Hotel, Inc. v. Time, Inc.* (5th Cir. 1970), 426 F.2d 858, decisions which have been cited for the proposition that the trial court should apply the actual malice test at the summary judgment stage by weighing both the evidence and credibility of witnesses.

Subsequent cases have dismissed this view as erroneous. In *Guam Federation of Teachers, Local 1581, A.F.T. v. Ysrael* (9th Cir. 1974), 492 F.2d 438, the court stated at 441:

"However, with respect, we are not persuaded by the second phase of Judge Wright's analysis in *Wasserman* which suggests that in deciding these motions, the trial court should judge the credibility of witnesses and draw its own inferences from the evidence. We think that in a libel case, as in other cases, the party against whom a motion for summary judgment, a motion for a directed verdict, or a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or of this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, when no contrary inference can legitimately be drawn), but that neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases.

The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the *New York Times* standard, the case is one for the jury, and it is error to grant a directed verdict, as the trial judge did in this case."

In *Hotchner v. Castillo-Puche, supra,* it was stated: "Principles applicable to summary judgment motions generally, are applicable to such motions when made in a defamation action." 404 F. Supp. at 1050. In *Goldwater v. Ginzburg, supra,* 414 F.2d 324, the court also found summary judgment to be inappropriate where "the non-moving party filed affidavits and relevant materials to show affirmatively that there was a genuine issue of fact to resolve, the existence of [defendant's] possible actual malice." *Id.* at 338, n. 21. We also agree with the court in *Heyman v. Commerce and Industry Insurance Co.* (2d Cir. 1975), 524 F.2d 1317, that summary judgment as a "procedural weapon is a drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." 524 F.2d at 1320.

This view is consistent with Indiana law concerning summary judgment in defamation suits. The court in *Aafco, supra,* set forth test:

> "Our review under the Indiana Standard is whether a genuine issue of material fact existed upon the defense of privilege asserted in [defendant's] answer. Stated in the context of the privilege: Were there any facts before the trial court which would place in issue [defendant's] knowledge that the articles were false or that the articles were published with reckless disregard of whether they were false." 321 N.E.2d at 590.

The court further noted:

> "A genuine issue of material fact is one dispositive of the litigation. If there are no facts presented by the interrogatories, depositions and affidavits which would place the defense of privilege at issue, the trial court's judgment should be affirmed." 321 N.E.2d at 590.

In *Estill v. Hearst Publishing Co., supra,* 186 F.2d 1017, the court in construing Indiana law also stated upon reversing a dismissal of a complaint: "[W]e think it cannot be said as a matter of law that the words were not susceptible of a defamatory meaning, hence we cannot agree with defendant's contention that the complaint was subject to dismissal. . . ." 186 F.2d at 1021.

In the case at hand, there are genuine issues of material fact presented by plaintiffs' affidavits and depositions which place at

issue: (1) whether the November 10 article was understood in a defamatory manner, and (2) whether the defendants' had reckless disregard for the falsity of the impression conveyed by that article.

The trial court's grant of summary judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Lybrook, J., (participating by designation) and White, J. concur.

NOTE—Reported at 372 N.E.2d 1211.